GEORGE W. PIKE, Appellant, v. WILLIS T. HONSINGER, Respondent.

1. PHYSICIANS AND SURGEONS — QUALIFICATIONS. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery.

2. CARE AND DILIGENCE. Upon consenting to treat a patient, it becomes the duty of a physician and surgeon to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed; and he is under the further obligation to use his best judgment in exercising his skill and applying his knowledge.

3. LIABILITY FOR INJURY TO PATIENT. The law holds a physician and surgeon liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment.

26

4. LEARNING AND SKILL. The rule in relation to learning and skill does not require a physician and surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been.

5. CARE AND DILIGENCE. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result.

6. CARE AND DILIGENCE. The exercise of reasonable care and diligence, the injurious want of which will render a physician and surgeon liable, includes not only the diagnosis and treatment, but also the giving of proper instructions to his patient in relation to conduct, exercise and the use of an injured limb.

7. ERROR OF JUDGMENT. The rule requiring a physician and surgeon to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination.

8. IMPLIED ENGAGEMENT WITH PATIENT. A physician and surgeon's implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result.

9. ACTION FOR MALPRACTICE — NEGLIGENCE OF SURGEON — EVIDENCE CALLING FOR SUBMISSION TO JURY. In an action against a physician and surgeon, for damages for negligence in treating the plaintiff's injured knee, a case calling for the submission of the question of negligence to the jury is made out when the evidence on behalf of the plaintiff is to the effect that the defendant omitted to reduce the swelling so that a safe diagnosis could be made; that he failed to discover that the real nature of the injury was a broken patella instead of a rupture of the ligaments; that he omitted to place the broken parts in apposition and to keep them there with proper appliances, and to take proper precautions as to quiet for a sufficient time to bring about the best result; that he dressed and flexed the leg without adequate care to keep the broken parts together, and told the plaintiff to flex it, without proper instructions to that end; that he permitted the plaintiff to use his leg too soon and in a hazardous manner, and assured him that his knee was getting along all right, thereby preventing the plaintiff from securing other medical treatment; and that such acts and omissions prevented a better recovery.

*Pike* v. *Honsinger*, 84 Hun, 607, reversed.

(Argued February 2, 1898; decided March 1, 1898.)

APPEAL from a judgment of the late General Term of the Supreme Court in the third judicial department, entered February 27, 1895, affirming a judgment in favor of the defendant entered upon a verdict directed by the court.

By this action the plaintiff sought to recover damages from the defendant, a physician and surgeon, for negligence in treating his knee, which had been injured by an accident. On the trial, at the close of the evidence given in behalf of the plaintiff, a motion for a nonsuit was made and denied, but at the close of all the evidence the court directed a verdict in favor of the defendant. After an affirmance by the General Term, without an opinion, the plaintiff came here.

The facts appear in the opinion.

*Thomas F. Conway* for appellant. It was error for the court to direct a verdict in favor of the defendant, because the evidence strongly tended to show that the defendant, in his treatment of plaintiff, either did not possess requisite skill, or, if he did, did not use it, and was guilty of negligence in his diagnosis and treatment. (*Carpenter* v. *Blake,* 10 Hun, 358; 75 N. Y. 12; *Patten* v. *Wiggen,* 2 Am. L. Reg. [N. S.] 403; 4 Wait's Act. & Def. 682; *Smothers* v. *Hauks,* 34 Iowa, 286; *Wells* v. *W. D. Assn.,* 9 N. Y. S. R. 456; *Barton* v. *Govan,* 4 N. Y. S. R. 876; *Link* v. *Sheldon,* 48 N. Y. S. R. 820; *Baird* v. *Gillett,* 47 N. Y. 186; *Harris* v. *Perry,* 89 N. Y. 311.) The learned trial court erred in accepting as conclusive the expert evidence, and particularly in overlooking the important particulars in which it tended to sustain plaintiff's case. (1 Whart. on Ev. § 454; *Templeton* v. *People,* 3 Hun, 357; 60 N. Y. 643.)

*Royal Corbin* for respondent. The plaintiff wholly failed to show that his condition was caused by the treatment of defendant. It was necessary to prove the injury would not have been present or to the same degree, except for the negligence of defendant. (25 N. Y. S. R. 482.) The medical man is not responsible for errors of judgment or mere mis-

takes in case of reasonable doubt and uncertainty. (McClelland's Civil Mal. 215.)

VANN, J. As the case was not submitted to the jury we must assume, on this review, that if they had been allowed to exercise their judgment they would have found all the facts in favor of the plaintiff that any reasonable view of the evidence would permit. Upon this basis the facts may be stated as follows: On the 2nd of May, 1888, the plaintiff, then forty-four years of age, with good health and sound limbs, had the patella or knee pan of his right leg broken by the kick of a horse. When the accident happened he was five miles from home and two and one-half miles from the village where the defendant, a physician and surgeon, resided. He drove to the office of the defendant, who was absent, but the father of the defendant, who was also a physician and surgeon, was there and treated the injury by applying on each side a strip of adhesive plaster twelve or fifteen inches long to the calf of the leg, and running it over the knee to the side of the thigh. The leg was then bandaged, a splint eighteen inches long put on, another bandage wrapped over all, and thereupon the plaintiff walked to his wagon and rode home over a rough road. He noticed on the way that the bandage and splint had become loose, and on reaching home, with the aid of his wife, he tightened them as well as he could. The leg received no further treatment, nor did the defendant see it until May 8th, six days after the accident, when he came to plaintiff's house in response to a message requesting him to call. He was told how his father had treated the injury; that the plaintiff rode home in a buggy and walked into the house, and that the bandage had come off and the splint had become loosened. At this time, when the defendant took charge of the case, the leg was so swollen at the knee that it was as large as the thigh, even when covered with clothing. He took off the bandages and splint, examined the injury, pronounced it a rupture of the ligaments, and told the plaintiff that he would have to lie in bed perfectly quiet

until they were united, which might take six or eight weeks. The bandages and splint were off about half an hour with nothing in their place, and during this time he measured both legs with a tape and rule and there was a difference of one-half inch between the two. When the rule was put across from one knee to the other it was not straight, but " higher up " on the injured than on the sound leg. After washing the parts he put the bandages and splint on " about the same as his father had," not in the shape of a figure " 8," nor by attaching the bandages to the splint at either end, nor were any means used to keep the leg steady below the splint. After placing some cushions on a board at the foot of the bed,· and placing the foot on them, he went away saying he would come again and bring a longer and better splint. He returned after an interval of three days, took off the short splint and the bandages and left them off while treating the leg for from twenty minutes to half an hour. He bathed the leg in warm water, restored the bandages and put on a long splint, which reached farther up the leg than the other and clear down to the heel, where the outer bandage was wrapped around the foot and fastened. The leg was still swollen and nothing was done to reduce the swelling on any of the visits except as stated. He made five visits in all, two during the first week, and the others on the 26th and 30th of May and the 7th of June, and at the latter date he took off the long splint and put on the short one again. On the day last named, or about five weeks after the accident, in response to questions put by the plaintiff, who was an assessor, the defendant told him he could go out assessing, but must be careful and not hurt the leg, saying that if he was thrown out of the wagon or was injured in any way by his own negligence he did not want to be responsible for it. He also told the plaintiff that he could walk around the house with the short splint on. The plaintiff did walk about the house a little, and in a few days began to attend to his business as assessor, being out two or three days in a buggy. He testified that his leg was not injured during this

time, and that while in the wagon his heel rested on some
boards attached to the dashboard and arranged for the pur-
pose.   The roads were rough and jolted a good deal and the
defendant was familiar with their condition as he traveled
them frequently.   During none of this time did he make any
effort to bring the separated parts of the patella together, and
the adhesive plasters, which the old doctor had applied, were
left on until the 15th of June, when the plaintiff called at the
defendant's office, pursuant to his direction, for further treat-
ment.   The defendant then took the plasters off, put his hand
under the leg and tried to bend it, but used no means to keep
the parts of the patella together as he did so.   He washed the
leg, which was still swollen, and put the short splint on again,
saying that a ligamentous union had begun.   While treating it
on this occasion there was nothing whatever on the leg.   He
gave the plaintiff some liniment to use, told him to work and
bend the leg and showed him how to put the splint and band-
age on, but gave no directions to keep the parts of the patella
together while working the leg, and after that visit the only
thing put on was the short splint and bandage.   When the plain-
tiff told him he had been out assessing the defendant did not,
object, but said that the leg was doing well.   The following Sat-
urday the plaintiff called at the office again and his leg was
treated as it had been before.   The defendant took the leg
across his knee and tried to work it, and said if it did not
loosen up he would put the plaintiff under the influence of
ether and " break the damn thing down."   He also told the
plaintiff to use some skunk's oil, if he could get it, and he did
so, and after that the knee " began to loosen up some " and
the upper part of the patella " began to slip up some."   About
the fifteenth of July the plaintiff told the defendant that his
leg was not set right as there was a space between the parts of
the patella, but the latter read from a work on surgery to
assure him that it was all right.   In August he asked the
defendant if it would hurt him to do a little haying, and was
told that it would not if he was careful, any more than to walk
around, and accordingly he rode on the mowing machine for

a few days, but was careful not to hurt his leg. He went to the office every week from the fifteenth of June until in September, when the splint was taken off by the defendant, who said the leg was doing well every time he saw it. About the first of March the plaintiff learned casually from another physician that the injury was a fracture of the patella, and soon after told the defendant, as he had insisted the summer before, that the leg was not set right. He made an examination and admitted that the knee cap was broken, although up to this time he had pronounced the injury a rupture of the ligaments, and had continuously declared that there was a good ligamentous union. A little later in the spring he informed the plaintiff that "the leg was not worth a damn and he would have to go into something else besides farming." At the time of the trial the plaintiff testified that the leg hurt him very much in driving, and that he could not walk on rough ground without his ankle turning over; that he could do but little on his farm and could not plow, drag or walk on plowed ground to any extent; that he was unable to lift half as much as he could before the accident, and not at all unless he stood straight, although before that he was accustomed to do all kinds of farm work; that he could not hold his leg up and was informed by physicians that there was no ligamentous union; that he relied on the defendant's statement that his leg was getting along all right, and that he would have a good leg, and did not get another physician for that reason.

Expert evidence was given tending to show that while a fracture of the patella is not common, a rupture of the ligaments connected therewith is very uncommon; that a powerful muscle extends from the lower portion of the patella to the bone below and serves to hold it in place from that direction, while on the upper side another muscle of great strength keeps it in place and controls its action from that direction; that these muscles cannot be controlled by strips of adhesive plaster in case the leg is flexed; that in treating an injury it is necessary to first know what the trouble is, and to reduce the swelling for that purpose; that while the parts of a broken

patella might be brought together if there was some swelling, it would be difficult to do so if the knee was swollen so that it was as large as the thigh, and that it would be very difficult, under those circumstances, to know whether the parts had been brought together or not; that in the case of a fractured patella it is important that the broken parts should be placed and kept in apposition, and that the patient should be kept perfectly quiet for eight or ten weeks until strong ligamentous union takes place, and the leg used very carefully afterward for a sufficient length of time to enable the ligaments to get strong enough not to rupture; that a splint should be put on as soon as possible and kept on for some time without being changed, so as to prevent separation of the bony parts; that it should be kept on even when the surgeon makes examinations, which should be frequent, in order to see whether reseparation has occurred; that flexing the limb should not be resorted to for eight or ten weeks, and when resorted to the patella should be supported from both directions by using pressure on both the upper and lower portions; that the splint should be kept on for about a year — a long splint for two or three months, and after that a short splint; that it would not be possible, with a splint extending from the center of the thigh to the middle of the leg, to keep the limb quiet so as not to have muscular action, as the patient moves about in bed even while asleep; that if obliged to use a short splint at first, a long one should be obtained and applied as soon as possible; that the patient should not be permitted to work or use his limb much for a year, and not to do very active work for a year and a half; that it would not be in accordance with the usual practice to permit a man with such a fracture, occurring in the fore part of May, to assist in haying and harvesting that season, with a short splint on about eighteen inches long, and that it would be extremely hazardous to allow him to ride over rough roads in a buggy along in June, as the probable result would be to break up what adhesion had taken place and leave the leg as though there had been no treatment whatever; that it is not the usual practice, after putting on a

long splint, to take it off with the bandages every week and
leave the patella and leg without any support except an
adhesive plaster, as this could not be safely done until two or
three weeks after treatment was commenced, and that then
there should be pressure when the bandages were removed;
that the fractured parts of the plaintiff's patella at the time
of the trial were about two and one-half inches apart when
the leg was flexed, and when extended about one and one-
half inches; that there is neither bony union nor ligamentous
union, and that the result is bad, although in a large majority
of such cases, by proper treatment, a good result is obtained.

While there was much conflict in the evidence, both in
relation to the treatment actually pursued, and as to the treat-
ment that should have been pursued, it was within the prov-
ince of the jury to settle the conflict by finding the facts as
thus stated. Could they, from those facts, have drawn the
inference of negligence, resulting injury and liability therefor?

The law relating to malpractice is simple and well settled,
although not always easy of application. A physician and
surgeon, by taking charge of a case, impliedly represents that
he possesses, and the law places upon him the duty of posses-
sing, that reasonable degree of learning and skill that is ordi-
narily possessed by physicians and surgeons in the locality
where he practices, and which is ordinarily regarded by those
conversant with the employment as necessary to qualify him
to engage in the business of practicing medicine and surgery.
Upon consenting to treat a patient, it becomes his duty to use
reasonable care and diligence in the exercise of his skill and
the application of his learning to accomplish the purpose for
which he was employed. He is under the further obligation
to use his best judgment in exercising his skill and applying
his knowledge. The law holds him liable for an injury to his
patient resulting from want of the requisite knowledge and
skill, or the omission to exercise reasonable care, or the failure
to use his best judgment. The rule in relation to learning and
skill does not require the surgeon to possess that extraordinary
learning and skill which belong only to a few men of rare

27

endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. This includes not only the diagnosis and treatment, but also the giving of proper instructions to his patient in relation to conduct, exercise and the use of an injured limb. The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result. (*Carpenter* v. *Blake*, 75 N. Y. 12; *S. C.*, 10 Hun, 358; 50 N. Y. 696; 60 Barb. 488; *Link* v. *Sheldon*, 136 N. Y. 1; *Patten* v. *Wiggin*, 51 Me. 594; *Hitchcock* v. *Burgett*, 38 Mich. 501; *Smothers* v. *Hanks*, 34 Iowa, 286; *McCandless* v. *McWha*, 22 Penn. St. 261; 14 Am. & Eng. Ency. of Law, 76.)

Having thus stated the nature of the injury and the condition of the plaintiff when the defendant took charge of him, the treatment actually pursued and the treatment that should have been pursued, as the jury might have found, as well as the general principles of law applicable to such cases, we think it follows that the learned trial judge should have submitted the case to the jury. While they might have found for the defendant if they believed him and his witnesses; if, on the other hand, they believed the plaintiff and his witnesses, they might have found that the defendant was guilty of negligence

in omitting to reduce the swelling so that a safe diagnosis could be made; in failing to discover that the real nature of the injury was a broken patella instead of a rupture of the ligaments; in omitting to place the broken parts in apposition, and to keep them there with proper appliances, and by taking proper precautions as to quiet for a sufficient length of time to bring about the best result; in dressing and flexing the leg without adequate care to keep the broken bones together, and in telling the plaintiff to flex it, without proper instructions to that end; in permitting the plaintiff to use his leg too soon and in a hazardous manner, and in assuring him that his knee was getting along all right and that he would have a good leg, and thereby preventing him from securing other medical treatment. They might also have found that such negligence injured the plaintiff by preventing a better recovery, which would lead to an assessment of damages.

We think there were questions of fact for the determination of the jury, and that, for the error in directing a verdict, the judgment should be reversed and a new trial granted, with costs to abide the event.

All concur, except BARTLETT, J., dissenting, and GRAY, J., absent.

Judgment reversed. _____