(161 App. Div. 387)

### ROTHENBERG v. COLLINS.

(Supreme Court, Appellate Division, Third Department.   March 13, 1914.)

1. APPEAL AND ERROR (§ 925*)—JUDGMENT—PRESUMPTION.

On appeal from a judgment, it will be presumed that the case was properly tried, and that all the rights of both parties have been disposed of in harmony with the rules of justice.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3729–3734;   Dec. Dig. § 925.*]

2. APPEAL AND ERROR (§ 1006*)—REVERSAL OF JUDGMENT—VERDICTS.

That the same verdict has been rendered on two different trials of the same case will not preclude reversal of the judgment on the second verdict, where the record shows that a fair trial was not had.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3951–3954;   Dec. Dig. § 1006.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. TRIAL (§ 108½*)—MALPRACTICE—EXAMINATION OF JURY—SUGGESTION OF INSURANCE.

Where, in an action against the visiting senior surgeon of a hospital, who was serving without pay, for damages from his negligent failure to care for plaintiff's dislocated knee, the evidence made a close case as to whether the surgeon had neglected to care for plaintiff to his injury and whether the want of treatment was not according to plaintiff's expressed wishes, and plaintiff's counsel sought to appeal to the prejudice of the jury by placing defendant, contrary to the facts, in the position of one owing a special duty to plaintiff out of the many patients at the hospital, the action of plaintiff's counsel in asking the jury whether they were interested in any insurance company issuing policies for protection against liability for injuries, and in stating that he knew of companies which insured against liability for injuries from malpractice, was ground for reversal.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 108½.*]

Howard, J., dissenting.

Appeal from Trial Term, Monroe County.

Action by August W. L. Rothenberg against Newton M. Collins. From judgment for plaintiff and denial of a new trial, defendant appeals. Reversed, and new trial granted.

See, also, 145 N. Y. Supp. 1143.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Reed & Shutt, of Rochester (George D. Reed, of Rochester, of counsel), for appellant.

George B. Draper and Stephen J. Warren, both of Rochester, for respondent.

WOODWARD, J. This action is brought to recover damages alleged to have been sustained by the plaintiff through the negligence of the defendant, a physician and surgeon, in attending the plaintiff, who suffered an injury to his leg in an accident while in the employ of the state upon the Barge canal. Upon a previous trial the jury found a verdict of $4,000 in favor of the plaintiff, the judgment being reversed on appeal to the Fourth Department on the ground that the verdict was against the weight of the evidence, though the learned court did not enter into a discussion of the merits of the case. 143 App. Div. 957, 128 N. Y. Supp. 1144. A second trial resulted in a like verdict of the same amount as that found upon the original trial, and the case has been certified to this department on an appeal fom the judgment entered upon the verdict, and from an order denying defendant's motion for a new trial.

[1] The learned trial court, in denying a motion for a new trial, after citing the rule laid down by the court for this character of actions in Pike v. Honsinger, 155 N. Y. 201, 49 N. E. 760, 63 Am. St. Rep. 655, says: "Within these rules, had it been my province to decide the questions of fact, I should have had no difficulty in reaching a conclusion adverse to plaintiff's right of recovery," and that, "While there is grave doubt as to whether the present verdict should be permitted to stand, still it should not be set aside except upon a careful

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

review of the testimony and a statement of reasons to justify it and to serve as a guide upon another trial," and so the case is passed on to this court for that "careful review of the testimony" which it is peculiarly the province of the trial court to make, with all of the details of the trial fresh in mind. A judgment of the trial court comes to an appellate court with the presumption that it has been properly tried; that all of the rights of both parties have been disposed of in harmony with the rules of justice, and a mere suggestion of doubt, out of harmony with the ruling, is of but little aid in the discharge of the duty which devolves upon the Appellate Court.

[2] While an examination of this case convinces us that there are questions of fact which belong to the jury to determine, and while, under ordinary circumstances, the fact that two juries have reached the same conclusion would be practically conclusive here, there is running through the entire record such a suggestion of unfairness in presentation, and the questions of fact are so lacking in conclusiveness, that we feel that the ends of justice require a new trial. If the same insidious effort to mislead characterized the trial which is apparent in the respondent's brief, it is easy to understand how a jury, with sympathies aroused for the misfortunes of the plaintiff, could be induced to overlook the weight of evidence, and to reach a conclusion which induced grave doubts in the mind of the trial justice. For instance, we are told that:

"Justice Foote denied the defendant's motion for a new trial, and wrote an opinion in which he carefully reviewed the rules of law applicable to the case, and held that under the evidence it was a case not within the province of the court, but within the province of the jury, to decide."

While this may be true in a sense, it very clearly does not express the real attitude of the learned trial justice, who distinctly suggests the propriety of setting aside the verdict "upon a careful review of the testimony and a statement of reasons to justify it, and to serve as a guide upon another trial." Again, we are told that the plaintiff was a strong, healthy man, who had never been sick or under a physician's care "until he was taken to the hospital and engaged the defendant to care for his dislocated knee, upon December 5, 1904"; that "plaintiff arrived at the hospital about 4 o'clock in the afternoon of December 5, 1904, was received in the emergency room, and soon thereafter engaged the defendant to treat his leg, and agreed to pay for such treatment." This, with much other matter, is asserted in the brief to convey the impression that the defendant was specially engaged to look after the plaintiff, while as a matter of fact the defendant was the visiting senior surgeon of the hospital, serving without pay, and the only evidence as to the engaging of the defendant is to be found at folio 129 of the record (cited by plaintiff's counsel), where the plaintiff testifies that on being brought into the hospital he found the nurse, Miss Myers, who asked him if he wanted a doctor to come there and take care of him, and he answered, "No." He then says:

"Collins [the defendant] came in, and he says: 'What's the matter mit you?' I say: 'J got a thing what you ought to find out. I think I got a broken leg.' 'Where you got it?' he says. I says, 'I got it in Brighton Lock, working for the state of New York there, and got hurt in the lock.' Then he

asked me was there a doctor coming here for you, and I says, 'No, sir, I got no doctor, I want the best doctor on this hospital to take care of my leg; if the state don't pay your bill, I pay the bill myself.' 'All right,' Dr. Collins said. I told him to take care of me then."

Clearly this was not a special employment of the defendant; it was merely an arrangement with the hospital, with an agreement to pay if the state of New York did not, and there is no evidence in the case to show that Dr. Collins ever considered the plaintiff as a private patient, or that he has ever made any charge for his services, or that the plaintiff has ever paid him anything. On the contrary the plaintiff was concededly a ward patient, and Dr. Collins testified that he did not receive any compensation from any one among the ward patients. Speaking of his position as senior surgeon, in charge of the ward service of the hospital, he says:

"It is an honorary position, and a position that there is never any price allowed to be charged to or paid by any ward patient in any hospital I ever heard of; they are supposed to be patients that are not able to pay a surgeon." Fol. 571.

[3] This is entirely uncontradicted; and, while it would not relieve the defendant of his obligation to use due care in the treatment of the patient, it is important as showing the "atmosphere" in which this action was tried, and the effort of plaintiff's counsel to appeal to the prejudices of the jury, by placing the defendant in the position of one owing a special duty to this one patient out of the many whom he was called upon to serve in the discharge of his honorary duties at the hospital in question. It is likewise important in connection with an exception saved by the defendant at the very opening of the case, and which, under other circumstances, might not be of controlling importance. In examining the jury counsel for the plaintiff said:

"I ask the jury to tell us if any of them are shareholders, stockholders, directors, officers, employés, or in any way interested in any insurance company issuing policies for protection against liability for damages for injury to person or property?"

This was objected to. The court asked if this was a negligence action, and, on being assured that it was a quasi negligence action, malpractice, the court said:

"If it is a malpractice action, you ought to ask them if they were stockholders or interested in any company insuring against malpractice."

Plaintiff's counsel replied:

"I tried to ask them in accordance with the statute."

Defendant's counsel objected to "all this proceeding before this jury," and the court responded:

"Of course that section is intended to apply to cases where there is a practice of insuring against liability for negligence. I have never heard of any practice that any company exists anywhere that insures a doctor against the results of his malpractice."

To this plaintiff's counsel replied "I have." Defendant's counsel excepted to the statement as—

"improper and incompetent, and as having a tendency to mislead the jury, and lead them off from the issue that will be tried."

The court permitted the question to be asked, and defendant's counsel excepted. The court then said:

"Anybody that is a stockholder in an indemnity company raise your right hand."

Counsel for plaintiff interposed, "Or otherwise interested." The court then announced that there was no such person, and defendant's counsel asked to withdraw a juror, which motion was denied, and the defendant took an exception. The court instructed the jury that:

"You are not to infer, gentlemen, from anything you have heard here this afternoon in reference to indemnity companies, that there is any indemnity company at all interested in this case. The law permits that kind of questions to be put to jurors because it is thought that sometimes jurors who have financial interests in companies insuring against accidents or injuries have a bias in their minds in that class of cases, and so it is thought proper that the parties should know whether jurors are of that type of mind, or their business is such that they might have a prejudice in that class of cases."

But the prejudice to the defendant is to be found, not so much in the question of whether any of the jurors were interested in indemnity insurance companies, but in the suggestion conveyed to the jurors by the assertion of counsel for plaintiff that he knew of corporations insuring doctors against malpractice; that the defendant was thus protected—that the burden of a verdict would fall upon a corporation rather than upon the individual who was before them—and this point was not cleared up before the jury by the remarks of the court. Moreover, it has been held that evidence that the defendant, in an action for negligence, was insured in a casualty company, or that the defense was conducted by an insurance company, is incompetent, and so dangerous as to require a reversal even when the court strikes it from the record and directs the jury to disregard it, unless it clearly appears that it could not have influenced the verdict. Simpson v. Foundation Co., 201 N. Y. 479, 490, 95 N. E. 10, 15 (Ann. Cas. 1912B, 321), and authorities there cited. In the case last above cited the court say:

"In Horden v. Salvation Army, supra [124 App. Div. 674, 109 N. Y. Supp. 131], Mr. Justice Ingraham said: 'The question as to whether or not under any circumstances evidence of this kind is competent has been so often before the court and so uniformly decided that there can be now no question that under no circumstances is it proper to ask such a question. The only possible ground of asking the question is to suggest to the jury that, as the defendant would sustain no damage by a verdict against it, they should give to the injured plaintiff compensation to which under other circumstances he would not be entitled. * * * As counsel in cases of this kind have been so often admonished as to the impropriety of suggesting, either by way of argument or by way of questions to the jury, or in any other way, that the defendant was protected by insurance, it seems to be unnecessary to say more than that such a suggestion in the presence of the jury will render any verdict that has been obtained by the plaintiff valueless, as a violation of the rule will require a reversal of the judgment.'"

In the Simpson v. Foundation Co. Case, supra, the court say:

"While there was no proof in this case that the defendant was insured, by suggestion and indirection the jury were given to understand that such was the fact, and the result, apparently, is reflected in the verdict"

—and the same might be said of the case now before us. The counsel for plaintiff had asked a general question whether any of the jurors

were interested as stockholders or otherwise in an insurance company issuing policies "for protection against liability for damages for injury to person or property," and the court had remarked, in passing upon an objection to the question as being incompetent, improper, and immaterial, that "if it is a malpractice action, you ought to ask them if they are stockholders or interested in any company insuring against malpractice." Later the court suggested, after further objection to the matter being brought out before the jury, that: "Of course that section is intended to apply to cases where there is a practice of insuring against liability arising from negligence. I have never heard of any practice that any company exists anywhere that insures a doctor against the results of his malpractice"—and plaintiff's counsel replied, "I have," thus clearly suggesting to the jury that there was such insurance in the case at bar, and forcing defendant's counsel to make objections where he was not in a position to make a denial. This was getting before the jury, "by suggestion and indirection," that which plaintiff's counsel had no right to do, and in a close case of this character it cannot be presumed that it did not have its influence upon the jury, and the instructions of the court did not operate to relieve the plaintiff from the error. See Stein v. Brooklyn, Q. Co. & Suburban R. R. Co., 62 Misc. Rep. 309, 114 N. Y. Supp. 791; Tincknell v. Ketchman, 78 Misc. Rep. 419, 139 N. Y. Supp. 620; Manigold v. Black River Traction Co., 81 App. Div. 381, 80 N. Y. Supp. 861. In the latter case the court say:

"The law is well settled that it is improper to show, in an action of negligence, that the defendant is insured against loss in case of a recovery against it on account of its negligence. This was expressly held in the case of Wildrick v. Moore, 66 Hun, 630 [22 N. Y. Supp. 1119]. It is not proper to inform the jury of such fact in any manner."

In the case now before us the plaintiff was taken to the Homeopathic Hospital, in the city of Rochester, on the 5th day of December, 1911, and it is conceded that there was a preliminary examination of the injury, and that certain X-ray pictures were immediately taken. The defendant testifies that on the following day he placed the plaintiff under an anæsthetic, and attempted to reduce the injury to the plaintiff's kneecap, and that he subsequently made a further attempt, but that, none of these proving entirely successful, he informed the plaintiff of the difficulty he had found, and told him that nothing short of an operation with the knife could promise a successful replacement, and that this involved certain dangers, and that the plaintiff refused to permit such an operation. The plaintiff, on the other hand, testifies that the defendant did nothing for him from the 5th day of December to the 13th and 14th, and that this was followed by a further attempt on the 28th; this later attempt being denied by the defendant. Right here is the most important conflict of evidence, and it is upon the proposition that the defendant, by failing to operate immediately, caused the leg to become stiff and incapacitated, afterward requiring a major operation in which the upper and lower bones of the leg were united, after removing the knee joint, that the plaintiff suffered injury. It is, however, possible to reconcile the testimony of both parties so far

as the good faith is concerned without necessarily finding that the defendant was guilty of neglect of any duty which he owed to the plaintiff. The defendant was the visiting surgeon at the time. He had several assistants, and it is well known that an operating physician does not attend to getting the patient ready for the operation, under ordinary circumstances, and if it happened to be the case that the plaintiff was prepared for the operation on the day following his coming to the hospital, and was placed under complete dominion of the anæsthetic, as the defendant says he was, he might not have any clear recollection of the presence of the defendant, or any recollection of the day. If this was true, the plaintiff might, in entire good faith, testify as he did that he had no treatment from the defendant between the day of his arrival and the 13th day of the month. If it was true that the defendant operated upon the plaintiff on the 6th day of December, the patient being completely under the influence of the anæsthetic, there is no evidence in the case from which the jury would have right to infer that it was negligent not to make a further attempt until the 13th, for there may have been a condition of the patient which made it imprudent to again subject him to the control of the anæsthetic without a complete rest, and a week would not be an unreasonable period.

But, assuming that there was such a conflict of evidence upon this question as to warrant the jury in finding that the defendant did not proceed as rapidly as he might have done, or as he ought to have done, the testimony of Frederick W. Zimmer, a surgeon of a different school of medicine, who afterward performed the major operation referred to above, shows conclusively that this failure was not the cause of the ultimate shortening of the leg and the removal of the joint, for his evidence is direct and positive that the plaintiff had sustained a fracture of the patella which had left pieces of bone in such a position that it was impossible to reduce the fracture and get the bones in a position to reunite without an operation with the knife, such as the defendant testifies he advised the plaintiff would be necessary. Plaintiff's witnesses never saw the leg while it was in its original condition; they merely testified from the X-ray pictures what they thought ought to have been done, and there was a decided conflict in the evidence, both as to the opinion of the witnesses and as to what was the correct version of the X-ray pictures, while Dr. Zimmer, who actually opened up the leg and took out the knee joint, testifies positively as to what he found, and says that no operation less than that involved in the use of the knife could have resulted in getting the pieces into position, and he does not believe that the plaintiff could have been given anything other than a stiff leg, though apparently having some confidence that it might not have been necessary to remove the kneejoint if the plaintiff had permitted an operation with the knife at the proper time. But the defendant had no right to perform a major operation, involving great danger to the plaintiff, without the latter's consent, and while the plaintiff denies that he refused such consent, the evidence can hardly be said to preponderate on the side of the plaintiff, for the defendant swears positively that he so advised the plaintiff, and that

the latter refused his consent, and the witness Helen Robinson, who was in training for nursing at the time, testifies that the plaintiff was in the operating room several times soon after his coming to the hospital, and that after one of these visits to the operating room Dr. Collins told him in her presence that he couldn't reduce the dislocation without opening the knee, and that the plaintiff—

"didn't seem to want to have it done. He said he would just let it go as it was, he didn't want to have it done; he was a little afraid of cutting."

Several other witnesses testify in reference to the operations of Dr. Collins, though they are not able to fix the exact dates, and it is difficult to understand how the jury could have reached the conclusion that the defendant neglected any duty which he owed to the plaintiff.

It does not, in view of the prejudicial error occurring at the opening of the trial, appear to be necessary to determine the question of the weight of evidence, or what is the effect to be given to a second verdict of the jury. The trial now under review did not preserve to the defendant his rights; his case was prejudiced by the interjection of matter having no relation to the issues, and which plaintiff's counsel must have known was highly improper, and the defendant ought not to be adjudged to pay this plaintiff $4,000, unless he has, by due process of law, established his superior right to the same, and this he has failed to do.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the final result.

LYON, J., concurs. SMITH, P. J., and KELLOGG, J., concur upon the ground that the verdict is against the weight of evidence. HOWARD, J., dissents.