MILLIE GREENSTEIN, Plaintiff, v. CARL H. FORNELL, Defendant.

Supreme Court, New York County, April 29, 1932.

*Bondy & Schloss* [ *Norman P. S. Schloss* of counsel], for the plaintiff.

*Lorenz J. Brosnan,* for the defendant.

SHIENTAG, J. Plaintiff, a young woman about thirty years of age, while working as cashier in a drug store, on December 29, 1929, met with an accident arising out of and in the course of her employment. She hurt her thumb and received what appeared to be a trivial injury. She continued working, but five days later, pain and a slight swelling having developed, she went for treatment to a Dr. Werner, a physician designated by her employer and his insurance carrier under the Workmen's Compensation Law. She was found to be suffering from cellulitis, an infection of the terminal phalanx of the left thumb. There was an infected spot along the base at the external corner of the nail. She received what may be characterized as conservative surgical treatment, and remained at her employment until January fourteenth, at which time, the thumb becoming worse, she was advised to stop work.

The delay in overcoming a seemingly slight infection caused her to inform Dr. Werner that she had been advised by her family physician, Dr. Kastenbaum, that she was suffering from diabetes. This fact appears in Dr. Werner's office records and he so indicated in his official report as attending physician. Plaintiff adhered to a rigid diet, and the thumb began to show signs of improvement. On January 24, 1929, the insurance carrier, apparently concerned over the fact that a slight injury was taking so long to heal, directed Dr. Werner to discontinue his treatment. Plaintiff was instructed to report at the office of the insurance carrier at 110 William street. She did so the same day, and an appointment was made for her to see the defendant, Dr. Fornell, the chief of the medical department, on January twenty-eighth. Notwithstanding the fact that she was injured on December twenty-ninth and commenced receiving medical treatment on January third, plaintiff continued to work until January fourteenth. She certainly was not a malingerer and there would seem to have been no good reason why the insurance carrier should have stopped treatment by Dr. Werner. Plaintiff saw Dr. Fornell at the office of the insurance carrier, and was advised that the nail of the thumb would have to be removed.

There is a sharp conflict in the testimony as to what occurred. Plaintiff says that she told Dr. Fornell of her diabetic condition and that her family physician had advised her not to have any operation or cutting done unless that condition was properly controlled; that Dr. Fornell became angry at what he termed interference of outside doctors and stated that plaintiff was now his patient and should follow his instructions; that the operation was perfectly safe and a trivial matter, and would enable her to return to work promptly. On January twenty-ninth plaintiff returned to the medical department of the insurance carrier at 110 William

street and permitted the nail to be removed by Dr. Fornell. The contention of Dr. Fornell is that he was not told by plaintiff about her diabetic condition until he removed the nail, and that just as he was bandaging the thumb she mentioned this circumstance to him quite casually; that he told her that this was important and to be sure to bring a specimen of her urine the next morning when she came for dressing. She was permitted to go home without receiving any insulin treatment. It would serve no useful purpose to review the testimony of this point in detail. Suffice it to say that in the light of the story told by Dr. Werner and his assistant, and by plaintiff's family physician, it is inconceivable that she should have failed to inform Dr. Fornell of her diabetic condition before the removal of the nail. That question of fact is resolved in favor of the plaintiff.

After the operation plaintiff felt too ill to return to the medical department of the insurance carrier the following day. On being so advised, Dr. Fornell, instead of visiting his patient himself, stated that he could not do so but would send another physician. He did send a Dr. Paine. Again there is sharp conflict in the testimony as to what occurred. Dr. Fornell says that he requested Dr. Paine to visit the plaintiff prepared to administer insulin. Dr. Paine says he asked to be allowed to inject insulin and to be furnished with a specimen of urine, but plaintiff refused, stating that she was under treatment for this condition by her family physician. Plaintiff denies this and is corroborated by her sister. Her family physician, who was called in, refused to interfere while another doctor was handling the case. Notwithstanding the alleged refusal to submit to insulin treatment, Dr. Paine continued to visit the plaintiff almost daily, dressing the wound, up to and including Sunday, February third. By this time the infection had spread; immediate operative interference was necessary. She was rushed to the Hospital for Ruptured and Crippled. Up to the time she was removed to the hospital Dr. Fornell, who had operated on her, had not visited her; there had been no blood-sugar test or urine analysis and no insulin administered. In the light of all of the evidence in the case, the story that, although the plaintiff had permitted the insurance company's physician, Dr. Fornell, to remove her infected nail, she declined to permit Dr. Paine to give her insulin treatment or to make a urine analysis, is so improbable, to put it conservatively, as to be unworthy of credence.

On her arrival at the hospital plaintiff was at once injected with insulin, a blood-sugar test was made, and on the following day she was operated on; a portion of the left thumb was amputated and long incisions made in her left wrist and forearm. She received a course

of insulin treatment and blood-sugar tests were made at regular intervals. While she was at the hospital Dr. Fornell visited her on a number of occasions. She was transferred by him to the New York Hospital which had better facilities for the control of her diabetic condition. After remaining in the hospitals for about two months she received treatment by Dr. Fornell for a period of about six months.

We have gone a long way to soften the rigor of the ancient law which held a surgeon to strict accountability, so that if he caused loss of life or limb he lost his hands. To-day the law approaches with sympathy and with understanding the difficult problems confronting a disciple of Hippocrates in the practice of his high calling. No member of any other profession gives of himself to the service of poor, suffering humanity more completely, more unselfishly, or more courageously. The physician, imbued with the high ideals and the lofty aspirations of his sacred calling, has truly been termed " the flower of our civilization * * *. Generosity he has, such as is possible to those who practice an art, never to those who drive a trade; discretion, tested by a hundred secrets; tact, tried in a thousand embarrassments; and what are more important, Herculean cheerfulness and courage." It is essential, therefore, that in the interests of science, and in order to promote the public health and welfare, the liability of a physician for the consequences of his professional acts shall be strictly limited, to the end that he shall not be made the prey of disappointed or ungrateful patients on the one hand, nor of malicious or unscrupulous patients on the other. Certainly, it is the aim of the law to avoid the criticism of malpractice actions so trenchantly expressed by Dr. Oliver Wendell Holmes when he condemned the holding of a physician to be liable " for what the ignorant ignorantly shall decide to be ignorance."

In order to recover in a malpractice suit, the plaintiff is required to establish the following propositions and each of them to the satisfaction of the court, by clear and convincing evidence: That the relation of physician and patient existed; that the physician violated some duty which he owed to the patient; that such violation of duty was the competent producing cause of the bad result complained of; and that the patient himself was free from any contributory negligence which was responsible for the resulting condition.

In this case it is conceded that the relationship of physician and patient existed. It is not required that such relationship be established by express contract or by the payment of a fee; nor is the relationship affected by the circumstance that the patient had no freedom of choice in the selection of the physician. The relationship exists when a physician treats a charity patient in the wards

of a public hospital. It certainly is present when a physician designated by the employer and insurance carrier treats an injured claimant under the Workmen's Compensation Law.

There is nothing in the case to indicate any carelessness on the part of the patient which was in any way responsible for the condition complained of; nor is there any evidence of any refusal or neglect on the part of the patient to follow the instructions given by the physician. There are left for consideration two questions: *First*, did the physician violate a duty which he owed to the patient; and *second*, was this violation of duty the competent, producing cause of the resulting injury?

A physician is not an insurer. He is not held to guarantee the success of his treatment. His duty is defined in the leading case of *Pike* v. *Honsinger* (155 N. Y. 201, 209) as follows: "Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times and a departure from approved methods and general use, if it injures the patient, will render him liable, however good his intentions may have been."

The plaintiff cannot succeed merely by establishing that the physician was guilty of a mistake of judgment. "The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination." (*Pike* v. *Honsinger, supra,* 210.) Nor does the law exact of a physician generally that high degree of knowledge and skill usually possessed by a specialist. The standard by which he is judged is the skill and knowledge of the ordinary practitioner of his locality. Certainly these rules clearly and succinctly formulated by our highest court, should be ample protection for any conscientious, competent member of the medical profession. But as has been frequently pointed out, "what divides and distracts us in the solution of a legal problem is not so much uncertainty about the law as uncertainty about the facts."

This court yields to none in its desire to throw every possible

safeguard around an honorable physician subjected to an action of this kind, which, if successful, involves not only a financial liability but inevitably carries with it a certain loss of professional standing which cannot be measured in dollars and cents. Whenever the evidence of liability is clear and convincing, however, it becomes the duty of the court to furnish to the injured patient the redress to which he is entitled. To perform this duty fairly and impartially is not only in the interests of the medical profession as a whole but is imperatively demanded as a matter of sound public policy.

If the defendant, Dr. Fornell, had taken the trouble to inquire of Dr. Werner, the physician designated by the employer and insurance carrier, concerning the plaintiff's course of treatment, he would have learned of her diabetic condition. A telephone message by a clerical assistant would have procured this information promptly.

It is contended, and with some reason, that any skilled physician in the exercise of ordinary care, particularly one who like the defendant specialized in injuries to workmen, should have had his suspicion aroused concerning a possible diabetic condition where a comparatively slight injury was taking an unusually long time to heal. It is urged, in any event, that in such case, the least a physician should do is to inquire of the patient whether there is anything in her medical history to account for the delay in healing, and particularly whether she has any history of diabetes. There is not the slightest suggestion that the defendant ever made any such inquiry. Let us assume for the purposes of this case that the failure to make such inquiry of Dr. Werner or of the patient, or to suspect the existence of a diabetic condition, may all be ascribed to errors of judgment, for which the defendant may not be held liable. It may further be assumed that the defendant used his best judgment in determining that the operation for the removal of the nail was emergent, and that he is not liable for any improper treatment or carelessness on the part of Dr. Paine whom he sent to the plaintiff after the operation. There is, however, no justification for the failure of the defendant, when he was informed of the plaintiff's diabetic condition, to administer insulin before the operation and immediately thereafter. Every physician knows of the danger of infection in diabetic patients, and of the danger of operative interference in such cases. Any physician, indeed any intelligent layman, knows about insulin; how it reinforces the excretion of certain cells in the pancreas and furnishes a powerful weapon in the treatment or control of a disease which in the past medical science often found itself helpless to combat. The defendant knew all this. His conduct cannot even be excused because of ignorance. It is due to neglect, to an indifference, a callous indifference completely out

of harmony with the precepts of the great calling to which he belongs. In an atmosphere of commercialism it is particularly important that the Æsculapian spirit be kept alive.

The medical profession has formulated a principle of conduct for its members, which is at least as high and as fine as that imposed by the law. Physicians should " ' not only be ever ready to respond to the calls of the sick and the injured, but should be mindful of the high character of their mission and of the responsibilities they incur in the discharge of their professional duties. In their ministrations they should never forget that the health and the lives of those entrusted to their care depend on skill and attention.' " (Principles of Professional Conduct adopted by the Medical Society of the State of New York. See " Courts and Doctors," by Lloyd Paul Stryker, p. 10.)

In this case the duty which the physician owed to his patient was clearly violated. That such violation of duty was the competent, producing cause of the spread of infection and the bad results experienced by the patient is amply demonstrated by the evidence.

The plaintiff in this case received an award of some $1,700 under the Workmen's Compensation Law. It is contended that the acceptance of this award precludes the plaintiff from instituting this action for malpractice; that she elected to proceed under the Workmen's Compensation Law as her sole and exclusive remedy. There is no merit to this contention. The remedies under the Workmen's Compensation Law and by way of suit for malpractice are in no way inconsistent.

The liability being clearly established, it remains to assess the damages. The stump resulting from the amputation is irregular, disfiguring and highly sensitive to touch. There is an appreciable loss of the use of the fingers of the left hand; the left forearm is marred by hideous scars. Making due allowance for the payment she received under the Workmen's Compensation Law, she is entitled to the sum of $6,000 in this action. Verdict is directed in favor of the plaintiff for the sum of $6,000; twenty days' stay of execution and thirty days to make a case.