Alexander Del Giorno, J.
This is a claim to recover damages for “ personal injuries and suffering prior to death ” sustained by the husband of claimant as a result of alleged negligent treatment rendered him by the State while he was a patient at Pilgrim State Hospital.
Upon an order of certification made by Hon. Samuel Dick-stein on January 30,1951, Abe Rosen, husband of claimant, was admitted to the hospital on February 1, 1951. The hospital records indicate that he had been totally blind for four years; that he was in a very depressed condition and constantly registered bitterness about somatic complaints all over his body.
On the examination before trial Dr. Barahal, associate director of the hospital, and prior to 1953 assistant director, testified that on March 1, 1951, his mental diagnosis of the patient was involutional psychosis, melancholia. Shock therapy was recommended by the assistant director of the hospital. On April 23, 1951, he received his first shock treatment. Following this shock treatment, the hospital records indicate that the patient complained of a backache, was talkative and fairly co-operative. *1043 Subsequent shock treatments were given on April 25, April 28, May 4 and May 7, 1951. An X ray of the patient was taken on April 30,1951, request having been made for an X ray showing anterior, posterior and lateral left hip. The finding of the X ray was: “ reading of the wet X-ray film of the left hip shows no evidence of a fracture ”, the note being made by Dr. M. J. Faruki, who was a physician in the Acute Medical and Surgical Building at the time, but who was not a roentgenologist. The doctor in charge of the Acute Medical and Surgical Building was Dr. Luke. No X ray was taken between that time and May 7,1951, on which date a further shock treatment was given. On May 16, 1951, another X ray was taken, and on March 26, 1952, a further X ray was taken. These three X rays were examined at the time of the examination before trial by claimant’s attorney and Dr. Maurice J. Feder. On the May 16, 1951 consultation, a 14 by 17 inch film of both hips and the upper part of the femurs was taken, the findings indicating that a film of the pelvic bones showed a “ fracture through the inferior ramus of the left pubic bone .extended across the superior border of the bone at its articulation with the ilium. The fragments are in good position. Recommendations: bed, immobilization. ’ ’ On March 26, 1952, a request was made for “an X ray stating diagnostic problem A.P. and lateral lumbar spine (?) physical cause of bent position.” The findings stated: “films of the lower 6th dorsal and the lumbar vertebrae show no bone or joint pathology other than an early osteoarthritis with slight lipping at the margins of the vertebral bodies. The patient had a fracture of the left pubic bone extending into the hip joint on May 16,1951. This fracture is visualized in this film and shows good bone union in good position. H. B. Luke, M.D.”
Dr. Harris was in charge of the patient during the period from April 23, 1951 through May 16, 1951. Dr. Luke, while not identified in his position with the hospital as a roentgenologist, had done a great deal of roentgenology, and in his position in 1951 as supervising psychiatrist in charge of the Acute Medical and Surgical Building and in charge of the X-ray department, read every X ray taken at the hospital during that period.
The shock treatment was discontinued after the treatment of May 7,1951, because the patient complained of pain in his foot, left leg and hip and .because he claimed that he could not straighten his leg. Another X ray was taken, which showed a fracture of the left pelvis.
Claimant, wife of the patient, had signed a permit for electric shock treatment to be administered to her husband.
*1044 Also in the examination before trial, Dr. Luke testified that in April, 1951, he was the physician in charge of the Acute Medical and Surgical Service and that he had charge of the X-ray department. He read the X ray of the patient taken on April 30, 1951, and concurred with the finding of Dr. Faruki. He stated that a ‘ ‘ wet ’ ’ X ray is a term used to describe a reading of an X ray as soon as it is developed, in emergency cases. He read the X-ray film after it dried and found no difference between that and his reading of the wet X ray. The X-ray report was then sent to Dr. Harris. On May 21, 1951, he made a note transferring the patient to the Chronic Surgical Ward for continued care of the fracture.
On the examination before trial, Mrs. Mildred Terp testified that she was staff nurse at the hospital, and first saw the patient on February 1, 1951; that she took care of him; that he first complained of pain in both legs on February 19, 1951; that on May 4, 1951, she applied a hot-water bottle to his left thigh, on orders of Dr. Harris; that she first was authorized to send the patient for shock treatment on April 23, 1951, again on April 25, April 27 and May 4. She was not present at the treatments. On the trial, she described the administration of shock treatment as follows: the patient is placed upon a stretcher, with a pillow beneath his kidneys and a rubber bit in his mouth. One hospital employee places his hands on the patient’s shoulders, another places his body across the patient’s legs, while holding the patient’s hands. The attending doctor operates the machine, which operation takes less than one second. The patient’s body goes into a tremor, then convulsion. She testified that the patient complained only after the third treatment, on April 28,1951. After May 16,1951, the patient received narcotics which are prescribed for sharp pains and before and after operations.
Dr. Feder, claimant’s witness, testified that he is a specialist in radiology and that he reads from 100 to 150 films a day, many of the pelvic region. He described the pelvis as being of prime importance, since it contains many of the viscera and constitutes the support of the upper body and the spinal region. On March 4, 1954, at the office of the Attorney-General, he examined the X-ray films in question. Without objection on the trial, there was read into the record his report thereon to claimant’s attorney, which is as follows:
4-30-51 Left Hip #L57321
There is discontinuity along the superior border of the neck of the femur, with an irregular linear zone of diminished density through the neck, representing fracture zone.
*1045 5-16-51 Pelvis #R57612
There is a stellate-shaped zone of diminished density through the acetabulum, on the left, in the region of the body of the pubis, representing fracture zone. There is discontinuity of the acetabulum margin superiorly and medially, representing depressed fracture.
3-27-52 Dorso-lumbar spine, A-P and R. Lat; #R64206
There is some narrowing of the vertical axis of the body of L4 centrally, with discontinuity of the superior articular surface, aseribable to compression. There is evidence of reactive change at the anterior articular margins.
With reference to Dr. Faruld’s note stating that a reading of the wet X-ray film did not show any injury, the witness testified that a wet film may not divulge damage, and that proper practice demands the taking of more than one view of a fracture so as to provide additional basis for proper study. On cross-examination, he admitted that he has disagreed at times with his colleagues as to readings of films. He stated that although at times he has read wet film, he never considered that final until it was confirmed by a dry reading. He insisted that the fracture evidenced in May, 1951, was present on April 30, 1951.
Testifying on behalf of claimant, Dr. Ralph Gf. Reed stated that he was licensed in 1909, has been attached to Central Islip State Hospital and Rockland State Hospital and has been in private practice as a psychiatrist since 1932. In the past 20 years he has given 150 shock treatments. He described the treatment as follows: pillows are placed under the back of the patient to support curvature, electrodes are placed upon his head; electricity is then applied and the patient goes into a convulsion which is both clonic and tonic. The tonic occurs first, the patient becoming rigid and stiff, at which time the clonic appears and the patient first relaxes, then exhibits the form of an epileptic fit. If he were not held properly, the patient could be propelled from the table and sustain fractures. He stated that sometimes shock treatment causes fracture. In the treatment, electricity is applied from three tenths to six tenths of a second with a voltage of from 100 to 130 volts. Convulsion first results, then unconsciousness which may vary from minutes to one-half hour. The patient awakens startled and confused, then depression sets in, lasting about 20 minutes. Afterward, he usually goes to sleep, awakens with a clearer mind and exhibits better conduct. He testified that no patient who has a large bone fracture, complete or incomplete, should be given shock treatment. If such a patient were to be so treated, there would be an immediate physical letdown, the patient being unable to walk, and the fracture itself would be placed out of alignment, with likely injury to surrounding soft *1046 tissue. He stated that the patient’s backache after the treatment of April 23 was presumptive evidence of a fracture, and it is possible there was a spinal contraction. From the subsequent history of the patient, he concluded that there was a fracture of the lower extremity. He himself would have given no further treatment until he had thoroughly ascertained if there was a fracture. He admitted inability to pass judgment upon the treatment rendered the patient because he knew nothing about him.
On cross-examination, he testified that Central Islip and Rockland State Hospitals did not employ shock therapy at the time he was attached to them, and that he learned about the application of electric shock treatment from the Medical Journal. Although he did not know what apparatus the State uses, he conceded that it uses the most modern machinery. He did not know how many types of electric shock methods there are, stating that he was concerned only with the treatment which is to produce convulsions in patients. He agreed that fractures may be an incident of shock treatments, and that the hospital records show that there was no aggravation or dislocation of the fracture, no malposition of the bones. As to the patient, he described a psychogenic complaint as one for which no pathological evidence may be found; although the pain originates only in the mind, it is as sharp as if it were actual physical pain. As to Rosen, suffering from involutional melancholia, he said the clinical notes showed he complained of stomachache, pains generally throughout his body, and general worry. In short, he was hypochondriacal.
The claimant then rested, and the State moved to dismiss the claim upon the ground that the claim was not filed according to law, which motion was denied. The State then moved, with specific reference to paragraph three of the claim, for a dismissal of the claim on the ground that claimant has not established a prima facie case. As to subdivisions “ a ” and “ b ” thereof, the motion was granted. As to subdivisions “ c ” and “d” thereof, decision was reserved.
The State then read into the record the note of Dr. Harris, dated May 20, 1951, as follows:
May 20, 1951 — shook treatment completed —
TRANSFERRED TO BUILDING 23
This patient was started on shock treatment on April 23, 1951. Shock treatment was being given to the patient because of his marked depression and possible suicidal trends. Since being admitted to the hospital the patient did not attempt suicide but continued to complain about everything. On April 28th, the patient developed severe pain in his left hip region and an X-ray was taken *1047 immediately. This X-ray was returned as negative for fracture. The patient was thoroughly examined physically and the pain seemed to decrease markedly. On May 4th, therefore, shock treatment was continued and on May 7th, on his 5th shock treatment, he again complained about severe pain in his left leg and hip. For this reason, shock treatment was again discontinued and another X-ray was taken. The second X-ray showed a fracture of the left pelvis and the patient was immediately transferred to Building 23 for further treatment. The patient appeared to be in fairly good physical condition except for the pain in his left hip and thigh region.
The State then rested, renewing the motions made at the close of claimant’s case.
The patient was admitted to the hospital on February 1, 1951 and died at the hospital on June 10, 1952 of cardiac hypoplasia. The hospital record indicates that during this time the State rendered him every conceivable attention and treatment in order to make his stay there as comfortable as possible and in an endeavor to improve the mental condition with which he was found to be suffering at the time of his admission. The question to be considered, therefore, is solely whether the State, through its hospital doctors, can be held to be guilty of negligence as to the administration of the electric shock treatment and the reading and analysis of the X rays which were taken.
The clinical notes are replete with references to the effect that the patient constantly registered complaints about general body ills and pains which upon physical examinations proved to be baseless. It is apparent that since he alluded constantly to pain which was not physical but existed only in his mind, he was a hypochondriac. Claimant’s witness, Dr. Reed, considered him such. While of course this situation would not justify the hospital in treating him any differently from other patients, nevertheless it is a factor which should be considered in making a determination herein, as bearing in whatever degree upon the reliance to be placed by the hospital authorities on his complaints of pain.
Dr. Faruki, hospital physician, on reading the wet X-ray film of April 30, 1951, found that there was no evidence of fracture; Dr. Luke, physician in charge of the Acute Medical and Surgical Service, examined this X ray within a day or two of Dr. Faruki’s report and concurred with his finding. At the time of Dr. Luke’s examination, the film was dry.
Claimant’s medical expert, Dr. Feder, examined the X-ray films in March, 1954, found fracture in the three X rays. He testified, however, on cross-examination, that he did not observe on the film of May 16, 1951, the fracture found on the film of April 30, 1951, although if the fracture had been present on April 30,1951, it would have shown on May 16, 1951. He testi *1048 tied further that if the fracture found on the film of May 16,1951 had existed on April 30, 1951, it could have been observed on April 30, 1951. He stated that the fracture could have been caused by numerous means.
So far as claimant’s witness, Dr. Reed, is concerned, the court is doubtful if he can be considered an expert as to electric shock treatment. When he was attached to Central Islip and Rockland State Hospitals, neither employed shock therapy. He admitted that he learned about the application of electric shock treatment by reading the Medical Journal. Accepting his testimony at face value, however, it is indicated that fracture may be an incident of shock treatment. He testified that there was no aggravation or dislocation of any fracture, no malposition of the bones.
In essence, this is a claim for malpractice. To recover damages, claimant must establish that the care afforded the patient was not performed in accordance with the proper and accepted methods then employed by the medical profession.
In the case of Pike v. Honsinger (155 N. Y. 201, 209-210) the court held: “ A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. * * * The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have *1049 bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. * * * The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result. (Carpenter v. Blake, 75 N. Y. 12; S. C., 10 Hun, 358; 50 N. Y. 696; 60 Barb. 488; Link v. Sheldon, 136 N. Y. 1; Patten v. Wiggin, 51 Me. 594; Hitchcock v. Burgett, 38 Mich. 501; Smothers v. Hanks, 34 Iowa, 286; McCandless v. McWha, 22 Penn. St. 261; 14 Am. & Eng. Ency. of Law, 76.) ”
Bearing in mind the fact that it is for the court to determine the credence and weight to be given to medical testimony (Scalone v. Scalone, 199 Misc. 210), very careful consideration has been given to the testimony and qualifications of claimant’s "witnesses, Dr. Peder and Dr. Reed. Their testimony has been reviewed with particular reference to their general knowledge of the subject and their general knowledge of the particular patient’s case herein involved.
The court finds that the practice and procedure of the hospital doctors have not been established by claimant to be other than standard and approved. Claimant has failed to show that the State doctors did not possess that reasonable degree of learning and skill that is required of physicians and psychiatrists in the locality in which they practiced and which is ordinarily regarded by those conversant with such employment as necessary to qualify them to engage in the practice of medicine and psychiatry. Nor has claimant shown that they failed to use reasonable care and diligence in the exercise of their skill or that they failed to use their best judgment in exercising their skill and applying their knowledge.
The motion of the State for a dismissal of the claim as to subdivision “ c ” of paragraph 3 thereof, which charged that the X rays taken of the decedent on or about April 30, 1951, were not accurately read and analyzed, is granted; the motion of the State for a dismissal of the claim as to subdivision “ d ” of paragraph 3 thereof, which charged that the electric shock treatment was negligently performed, is granted.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
The claim is dismissed.
Let judgment be entered accordingly.