**Elba PEPE, as Administratrix of the Estate of Amato Pepe, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 82 CV 3454.**

United States District Court, E.D. New York.

Dec. 18, 1984.

Kelner & Kelner, Martin Rubinstein (of counsel), New York City, for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Kevin P. Simmons, Asst. U.S. Atty., Brooklyn, N.Y. (of counsel), for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This action under the Federal Tort Claims Act (28 U.S.C. § 2675) seeks damages for the personal injury and wrongful death of Amato Pepe. Mr. Pepe was treated at the New York Veterans Administration ("V.A.") Hospital on November 21, 1977; he was sent home where he collapsed that very night. He died on November 22, 1977 without ever regaining consciousness.

Mr. Pepe's widow brings this action for malpractice, arguing that the V.A. physicians failed to diagnose Pepe's true condition and failed to admit him for testing and observation. The case was tried before me without a jury. The following constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## Findings of Fact
### The Family Doctors

On November 4, 1977, Amato Pepe went to see his family physician, Dr. Dino Belletti. Dr. Belletti, who did not testify, but whose deposition was admitted, is a specialist in internal medicine with an emphasis in cardiology. Dr. Belletti is an attending physician at Astoria General Hospital, a part-time staff cardiologist at the Bronx V.A. Hospital and a former Director of Cardiology at Physicians Hospital. (Belletti Deposition ("Dep.") at 9–10).

Pepe told Dr. Belletti that he was seeing "flashing lights" in his left eye. Pepe also told Belletti that he was a heavy smoker. (Belletti Dep. at 12). In fact, Pepe was at that time smoking 2–3 packs of cigarettes daily.

Dr. Belletti examined Pepe and concluded that he was suffering from optic neuritis, secondary to either tobacco, diabetes or drugs. (Belletti Dep. at 13). He prescribed 500 mg. Vitamin C daily, advised Pepe to quit smoking, and referred Pepe to an ophthalmologist and a neurologist. He also told Pepe that he was suffering from nicotine poisoning. (Elba Pepe Nunez [*] Dep. at 37).

Dr. Belletti's medical chart for that visit contains no record that Pepe complained of chest pain, hallucinations, right shoulder pain or pain in the abdomen. (Belletti Dep. at 17) (Government's Exhibit ("GX") B). Dr. Belletti stated that if Pepe had such complaints, he would have noted them on the chart. Dr. Belletti also said that it was his usual practice to examine a patient's lungs and abdomen. He also stated that if he had found any abnormality he would have recorded it in the patient's chart. (Belletti Dep. at 18–19).

On November 9, 1977, Pepe was examined by Dr. Clyde R. Locke, an ophthalmologist. Dr. Locke noted that ocular examination was normal except for narrowing of the retinal vessels suggestive of arteriosclerotic changes. (GX A). Dr. Michael Baden, an expert for the defendant, testi-

fied that Dr. Locke's records did not indicate that Pepe voiced any complaints related to a cardiac condition. He also testified that Dr. Locke's records indicated that his examination of Pepe resulted in no findings of significance.

On November 21, 1977, Pepe suffered some sort of attack at work. He did not look well and was hallucinating. His wife, who worked in the same office, took him back to Dr. Belletti. While waiting in the doctor's office, Pepe continued to hallucinate, going so far as to carry on a conversation with a picture on the doctor's wall.

Dr. Belletti's medical chart for this visit contains no notation that Pepe complained of chest pain, right shoulder pain or epigastric pain (Belletti Dep. at 25–26). Belletti's chart also contains no record that Pepe had provided him with a history of hypertension. (Belletti Dep. at 27) (GX B).

At this time, however, because Pepe still suffered from loss of vision in his left eye, Dr. Belletti advised Pepe to seek hospitalization. (Belletti Dep. at 20). Accordingly, he gave Pepe a note which stated:

> Please admit Mr. Amato Pepe, has visual hallucinations with a past history of headaches. Only medication Vitamin C; 500 mg. TED.

(GX C) (Belletti Dep. at 20).

It is important to note that Dr. Belletti did not have admitting privileges at the New York V.A. Hospital. Thus his note was, at best, a request for admission of Mr. Pepe. The final decision to admit a patient into the hospital had to be made in the sole discretion of the emergency room physicians.

### The V.A. Hospital

Pepe and his wife, Elba, went immediately to the emergency room of the New York V.A. Hospital. In an admissions form, Pepe stated that he was seeking treatment for an "eye problem." (GX D). The nurse at admissions noted that Pepe's temperature was 99°, his pulse was 100 and his blood pressure was 150/90. (GX E).

---

[*] Mrs. Pepe has remarried since the death of Amato Pepe.

Pepe was seen by the hospital medical officer of the day who noted that plaintiff was having visual hallucinations and exhibiting paranoid overt behavior. The medical officer filled out a psychiatric consultation request for Pepe (GX F) (Osofsky Dep. at 7).

Pepe was examined by Dr. Gerald H. Osofsky, a resident psychiatrist. Dr. Osofsky testified that he interviewed Pepe and his wife. He noted in the chart that Pepe's chief complaint was: "[h]allucinations visual—sees small flicks of light which 'pull' his eyes to the side and he sees his wife working with [patients] who smoke too much." (GX F). Mrs. Pepe reported to Dr. Osofsky that her husband was acting strangely by locking himself in the bathroom and saying people were going to come into the house. (GX F). (Osofsky Dep. at 9–10).

Dr. Osofsky noted that Pepe had no prior psychiatric history and that Mrs. Pepe advised him that Pepe was fine until "1 week ago." (GX F). The chart also reflects that Pepe and his wife told Osofsky that Pepe had been advised by Dr. Belletti one week prior to stop smoking because of nicotine poisoning. (Id.)

Dr. Osofsky testified that in view of the fact that Pepe had no prior history of psychiatric illness, he was particularly interested in inquiring into possible physical problems associated with the symptoms. Accordingly, although he could not specifically recall his exact examination of Pepe, his usual examination would consist of questions regarding physical complaints such as shortness of breath and chest pains. He testified that he would not record the absence of such physical complaints in his medical charts. Dr. Osofsky testified that both Pepe and his wife indicated that Pepe did not have any physical problems. (Osofsky Dep. at 11).

Dr. Osofsky performed a mental status test on Pepe and noted that Pepe was alert and in no acute distress. He also reported that Pepe denied any neurological problems, and had no problems eating or sleeping. (GX F) (Osofsky Dep. at 14). Finally, he noted that there was no evidence of thought disorder or delusional thinking. (Id.).

Based upon his examination, Dr. Osofsky concluded that it was unlikely that Pepe suffered from an acute psychotic attack but that a "metabolic, infectious or other neurological etiology" had to be considered. Accordingly, he suggested that Pepe undergo a neurological consultation. (GX F) (Osofsky Dep. at 14) (Dr. Jacob Oberman, the plaintiff's expert, has no quarrel with the manner in which Dr. Osofsky acted.).

Pepe was immediately seen by Dr. Mark Friedman, a physician in the neurology service of the V.A. Hospital. Dr. Friedman took a patient history from Pepe and his wife. Friedman recorded that Pepe denied that he had experienced headaches, loss of consciousness, dizziness, diploplia and auditory hallucinations (GX G) (Friedman Dep. at 7). Dr. Friedman then performed a neurological examination of Pepe which included evaluation of Pepe's mental status, orientation processes and sensory-neurological functions. (Friedman Dep. at 10). The examination was within normal limits with the exception of the mental status. As to mental status, Friedman noted that Pepe had paranoid ideation but was without any amnesia or abnormal thoughts. (Friedman Dep. at 10). Dr. Friedman concluded that there was no evidence of organic or neurological problems (Friedman Dep. at 11). He decided not to admit Pepe to the hospital (Friedman Dep. at 13), and recommended that Pepe should be given an appointment to return to the neurology clinic in order to determine if there was any change in his condition which would warrant further testing. (GX G).

Following the neurological examination, Pepe was referred back to Dr. Osofsky, who noted that Pepe had been cleared by Neurology. He prescribed and administered orally a 2 mg. tablet of Haldol to Pepe and gave him a prescription for additional tablets that could be filled the following day when the hospital pharmacy was open. Pepe was then discharged from the emergency room. Osofsky testified that

Haldol is specifically designed to treat hallucinations or loss of contact with reality.

Mrs. Pepe acknowledges that neither she nor her husband related any symptoms involving chest pain, arm pain or shoulder pain to the physicians at the V.A. Hospital.

### The Collapse

Pepe and his wife then returned home. Mrs. Pepe stated that Pepe "wasn't that bad, he was happy, talking a little bit, stuff like that." (Nunez Dep. at 63). After watching television, Pepe stated that he was going to bed because he had a "tough day." (Nunez Dep. at 63).

At approximately 2:00 A.M. on November 22, 1977, Pepe was found unconscious by his wife on the floor; in addition, his heart had stopped beating. He was transferred by ambulance to Elmhurst General Hospital. The medical chart at Elmhurst noted that Pepe was unconscious even after resuscitation. The chart noted that he had no previous history of heart disease or hypertension (GX I at 3).

A cardiology attending note, dated November 22, 1977, written by Dr. Frank J. Lane, stated that when Pepe was brought into the hospital he had no blood pressure or pulse and that an electrocardiogram revealed a straight line. He also stated that Pepe was given several intercardiac injections of adrenalin, calcium chloride and sodium bicarbonate. Dr. Lane noted that cardiac rhythm was restored as was sinus tachycardia. (GX I at 9). Dr. Lane also noted that an EKG revealed no definite evidence of recent myocardial infarction. (GX I at 9). And Dr. Baden, the defendant's expert pathologist, could find no evidence in the hospital records that Pepe had suffered a heart attack.

Pepe never regained consciousness, and died on November 22, 1977 at 3:55 p.m. in Elmhurst Hospital. The cause of death was listed as cardiorespiratory arrest, myocardial infarction, and coma from unknown etiology. (GX I at 6).

### The Autopsy

On November 23, 1977, an autopsy was performed by the pathology staff at Elmhurst City Hospital. The autopsy report noted that Pepe did not have a history of diabetes, heart disease or alcoholism, although both his heart and liver were severely enlarged. The latter was twice its normal size, which Dr. Baden characterized as "most suggestive of an alcoholic origin." The report also noted that an EKG showed no definite evidence of an acute myocardial infarction. The report concluded that Pepe had suffered from (1) severe coronary atherosclerosis, with evidence of old and recent myocardial infarctions; (2) cirrhosis of the liver; (3) chronic pancreatitis; and (4) hyperglycemia (clinical). The report stated that the cause of death was an acute myocardial infarct. (GX J at 6).

Drs. Baden and Tice, two most impressive witnesses, testified that the finding of clinical hyperglycemia did not mean that Pepe had diabetes. Both physicians testified that the high blood sugar level as found by the autopsy was caused by the infusion of a sugar water solution in the Elmhurst Emergency room. Dr. Tice testified that, in his opinion, Pepe did not suffer from diabetes. Dr. Tice further testified that there may be "100 reasons" for a finding of high blood sugar and that Pepe's cirrhosis and chronic pancreatitis could have contributed to such a finding.

Both doctors testified that the finding of cirrhosis was inconsistent with the medical history given by Pepe and his wife to the physicians at the V.A. The autopsy report concluded that the cirrhosis was compatible with alcoholic etiology. (GX J at 6).

Drs. Baden and Tice testified that Pepe had a maximum life expectancy of 5 years. Dr. Baden testified that Pepe was a "time bomb" and death could have come at any time. Dr. Tice testified that due to extensive cardiac and liver disease, Pepe's life expectancy could be as short as 6 months and that Pepe could have died "tomorrow."

### Conclusions of Law

Under the Federal Tort Claims Act, the liability of the United States for a negli-

gent act or omission is determined under the law of the State where the alleged negligence occurred, viz., New York. 28 U.S.C. § 1346(b) (1982). Plaintiff's theory of liability is that Amato Pepe died as a result of the malpractice of Doctors Osofsky and Friedman, who were admittedly employees of the V.A. hospital.

■ In New York law a doctor is liable for malpractice if he either lacks or fails to exercise that degree of knowledge, care and skill expected of the average physician in the same locality and of the same class of physicians to which he belongs, or if he fails to use his best judgment in applying his knowledge and skill. *Pike v. Honsinger*, 155 N.Y. 201, 209, 49 N.E. 760 (1898); *Littlejohn v. New York*, 87 A.D.2d 951, 952, 451 N.Y.S.2d 225, 226 (3d Dept. 1982). Thus, the issue in a malpractice action is whether plaintiff has established that what the doctor did or failed to do in his treatment of plaintiff constituted a departure from this standard of care. *Spitzer v. Ciprut*, 80 A.D.2d 891, 437 N.Y.S.2d 27, 28 (2d Dep't 1981).

■ Having heard all the evidence and having reviewed all the exhibits in this case, the conclusion is irresistible that the tragic death of Amato Pepe was not due to malpractice by defendant's doctors. There is no evidence in the record that the doctors departed from the standard of care expected of physicians in this class.

The key to this case lies in the cause of Pepe's death. It is clear that he did not die of diabetes, hyperglycemia or any of the other conditions emphasized by plaintiff. He died of severe coronary atherosclerosis complicated by cirrhosis of the liver, the latter most likely caused by alcohol. These disabling, and eventually, fatal conditions could not have been discovered except, after death, by an autopsy.

The hallucinations, eye problems, and other symptoms of which Pepe complained cannot reasonably be found to have alerted the doctors in the emergency room of the V.A. Hospital that they were dealing with a patient who was at death's door. Retrospect tells us that; but that, of course, is not the test.

I agree with the testimony of Doctors Tice and Baden that Pepe was not a candidate for admission to the V.A. and that the physicians at the V.A. did not depart from accepted standards of medical practice and conduct when they exercised their discretion and decided not to admit Pepe to the hospital.

Accordingly, judgment will be entered for the defendant.

SO ORDERED.