■ JOSEPHINE VERA et al., Respondents-Appellants, v BETH ISRAEL MEDICAL HOSPITAL et al., Appellants-Respondents. [625 NYS2d 499] —Judgment, Supreme Court, New York County (Ira Gammerman, J.), entered June 30, 1994, in favor of the plaintiffs on their causes of action alleging psychiatric malpractice, reversed, on the law and the facts, without costs, and the complaint dismissed.

Plaintiff Josephine Vera, a chronic schizophrenic was admitted to the Beth Israel Medical Hospital (Beth Israel) on June 27, 1984 suffering from an acute exacerbation of her schizophrenia, which included command auditory hallucinations telling her to jump out of a window. The uncontradicted determination by the defendant doctor was that the exacerbation was due, in part, to her failure to take her medication. Plaintiff's hospital record reflects that appropriate psychotropic medication served to decrease plaintiff's anxiety about the voices she heard. Plaintiff was treated with increasing amounts of the drug Prolixin until a "therapeutic" dosage was established. This dosage was 70 milligrams per day administered orally twice a day in 35 milligram amounts. Plaintiff's condition improved such that by the third day of her hospitalization the lethal auditory command hallucinations had subsided.

Due to plaintiff's noncompliance, i.e., her failure to take her medication when not under supervision, it was determined that she should be given Prolixin Decanoate, an injectable form of the medication that is released into the patient's blood stream over time. Administration of the medication in this form would maintain a desired therapeutic level of the medication in the patient for a period of two to three weeks and would effectively deal with plaintiff's noncompliance. The oral form of the medication was discontinued and plaintiff given an

injection of Prolixin Decanoate approximately 47 hours before she was released into her sister's custody. Plaintiff's sister arranged for a nursing aide to remain with Ms. Vera while she was at work. Approximately two hours after her release from the hospital, and shortly after her sister left her with the nursing aide, the injured plaintiff jumped from the fifth floor fire escape of her sister's apartment and sustained massive injuries. The injured plaintiff's testimony at trial was that she heard voices which told her that she should jump.

Plaintiffs at trial did not take issue with the treatment rendered to the injured plaintiff while in the hospital. Nor was it contended that the use of Prolixin Decanoate which required plaintiff to return to the hospital emergency room for subsequent injections, constituted a departure from acceptable practice. Plaintiffs' theory of liability in this case was, in essence, that the injured plaintiff was released prematurely and without an adequate amount of Prolixin Decanoate in her blood, i.e., that injection given was not in a high enough dosage to achieve the desired therapeutic level of Prolixin in her blood at the time of discharge and that the defendants released the injured plaintiff before the Prolixin Decanoate could have had the desired therapeutic effect.

"It is a well-established principle of medical jurisprudence that no liability obtains for an erroneous professional medical judgment" (Bell v New York City Health & Hosps. Corp., 90 AD2d 270, 279, citing Pike v Honsinger, 155 NY 201, 210; DuBois v Decker, 130 NY 325, 330). This rule is applicable to psychiatry (supra). Claims for psychiatric malpractice often involve the soundness of a decision to release a patient who had been confined for treatment (supra). Therefore "[f]or liability to ensue, it must be shown that the decision to release a psychiatric patient was ' " 'something less than a professional medical determination' " ' (Davitt v State of New York, 157 AD2d 703; Mohan v Westchester County Med. Ctr., 145 AD2d 474)" (Darren v Safier, 207 AD2d 473, 474). Moreover, in our review of these cases we must be mindful of the fact that the " 'prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk.' " (Bell v New York City Health & Hosps. Corp., supra, at 280, quoting Taig v State of New York, 19 AD2d 182, 183.) The risk is " 'one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others' " (supra, at 280).

Much of the expert testimony in this case was concerned

with determining the exact amount of Prolixin in the injured plaintiff's blood at the time of discharge. However, the experts failed to present consistent testimony concerning their estimations of the injured plaintiff's blood level of Prolixin at the time of her discharge. Moreover, review of the testimony demonstrates that, by and large these hindsight estimates were made without consideration of the fact that Ms. Vera's medical record showed that she was also suffering from hepatitis, which in uncontradicted testimony, was stated to inhibit her liver function, which would in turn have the effect of increasing the effectiveness of the Prolixin in her blood stream. The only consistent facts presented in all of the testimony concerning the Prolixin Decanoate were that according to the Physicians Desk Reference the onset of action of Prolixin Decanoate, in patients with no Prolixin in their blood stream, generally appears between 24 and 72 hours after injection and that the effects of the drug on psychotic symptoms becomes significant within 48 to 96 hours after injection.

Of great significance in this case is the fact that all of the expert witnesses who testified agreed that it was not standard practice, and was in fact not the practice at all, to take daily blood levels from a patient receiving either form of Prolixin. The reason given by all of the medical experts, including plaintiffs' expert, was that the exact amount of Prolixin in a patient's blood stream is not important since it is not correlated with clinical response. In fact, one of the experts termed measurement of the exact amount of this medication in a patient to be immaterial. All of the expert medical witnesses testified that the only way to determine if Prolixin is having a desired therapeutic effect is through clinical examination. The experts uniformly described a psychiatric clinical examination as consisting of an evaluation of the patient through an interview and observation of her responses, appearance, general behavior and demeanor. Plaintiff's expert testified on cross-examination as follows:

"[QUESTION]: * * * when you have your patients on Prolixin do you do daily or weekly blood levels?

"[PLAINTIFFS' EXPERT]: No.

"[QUESTION]: In fact, no psychiatrist does daily or weekly blood levels, right?

"[PLAINTIFFS' EXPERT]: Not at all.

"[QUESTION]: And the reason why you don't do daily or weekly blood levels in people on Depot Prolixin is because

what you are interested in is not the exact amount that is in their bloodstream, but what is the therapeutic effect upon the patient correct?

"[PLAINTIFFS' EXPERT]: Exactly.

"[QUESTION]: And in order to see the therapeutic effect upon the patient, you have to examine the patient and watch the patient and see how they react, correct?

"[PLAINTIFFS' EXPERT]: Exactly. For a period of time."

Therefore, it is clear that the determination concerning whether or not the injured plaintiff received a sufficient amount of the medication to maintain the previously obtained therapeutic level so as to warrant discharge could only be based upon a careful clinical examination. The record reflects that the defendant doctor saw Ms. Vera every day. Nowhere in the record of this case is there any testimony that the defendants failed to conduct a careful examination of this patient before she was discharged. Plaintiffs' own expert Dr. Tuckman testified as follows:

"[QUESTION]: Doctor, I am going to ask you some questions and I would ask that each of these questions that you give your opinion with a reasonable degree of medical certainty as we go along, okay?

"[DR. TUCKMAN]: Yes.

"[QUESTION]: As to whether or not Josephine Vera's discharge from Beth Israel Hospital on July 17 was based upon careful examination of Josephine Vera and her psychiatric conditions, do you have an opinion as to whether or not that was done, just tell me yes or no first?

"[DR. TUCKMAN]: Yes.

"[QUESTION]: What is your opinion?

"[DR. TUCKMAN]: That it was performed with careful examination as far as I saw."

Dr. Tuckman's testimony immediately following the above exchange in which he stated why he would not have discharged Ms. Vera on July 17, 1984, demonstrated only that given the same set of circumstances, he would have observed her for a longer period before releasing her. In response to the trial court's question as to whether he considered the administration of a 50 milligram dose to this patient a departure Dr. Tuckman stated that in and of itself the dosage was not a departure.

Therefore it cannot be said that plaintiff demonstrated that the decision to release this patient was based upon

" ' " 'something less than a professional medical determination' " ' " (*Darren v Safier,* 207 AD2d, *supra,* at 474). Just as in *Darren v Safier (supra),* Dr. Tuckman's disagreement as to the time of discharge of Ms. Vera under the circumstances of this case "represents, at most, a difference of opinion among physicians, which is not sufficient to sustain a prima facie case of malpractice" (*Darren v Safier, supra,* at 474). Thus we find that there was ample reason to grant defendants' motion to dismiss at the end of the plaintiffs' case and that it was error not to grant defendants' motion to dismiss made after both parties rested.

The dissent, apparently concerned with a review of the jury's verdict, misconstrues the grounds on which we would reverse. It is clear that the error upon which we reverse was that of the trial court in submitting the matter to the jury in the first instance. Furthermore, the foregoing makes plain that our determination was based upon the fact that all of the experts, including plaintiffs' expert, testified that the exact level of Prolixin Decanoate in the patient's blood was irrelevant, as its therapeutic effect can only be evaluated by clinical examination, and the fact that even plaintiffs' expert acknowledged that the defendant doctor conducted a "careful examination" of the injured plaintiff before her discharge. Finally, the issue in this case is not whether Dr. Schwartz's decision on July 15th was a departure, but whether Ms. Vera's actual discharge 2 days later on July 17th was based upon " ' " 'something less than a professional medical determination.' " ' " (*Supra,* at 474.)

We have reviewed the other arguments raised by the parties and find that we need not reach them in view of our determination or that they are otherwise without merit. Concur—Kupferman, J. P., Ross, Asch and Nardelli, JJ.

Mazzarelli, J., dissents in a memorandum as follows: In reviewing the jury's finding of liability in this psychiatric malpractice action, plaintiff is entitled to the most favorable view of the evidence and the benefit of every reasonable inference which can be drawn from that evidence (*Eppel v Fredericks,* 203 AD2d 152). When, as here, the record contains conflicting medical testimony, the resolution of such conflicts, as well as the evaluation of the credibility and accuracy of witnesses' testimony is a matter within the province of the jury (*Aunchman v Palen,* 186 AD2d 104, *lv denied* 81 NY2d 702; *Shaw v Binghamton Lodge No. 852,* 155 AD2d 805). If the jury's verdict in this matter was not "utterly irrational", given the evidence in the record, it should not be set aside for

legal insufficiency *(Hoffson v Orentreich,* 168 AD2d 243, 245). A jury's verdict should not be set aside as against the weight of the evidence "unless the jury could not have reached the verdict on any fair interpretation of the evidence" *(supra,* at 244). With these principles in mind, I cannot agree with the majority that the trial court erred in refusing to grant defendants' motion to dismiss the complaint at the close of all the evidence because of legally insufficient evidence. Therefore, I dissent.

When plaintiff Josephine Vera, a 34-year-old chronic schizophrenic, was involuntarily committed by her sister to the psychiatric unit at the Beth Israel Medical Hospital on June 27, 1984, she was agitated, disoriented, and experiencing auditory command hallucinations of a lethal nature. Ms. Vera's admission record notes: "Pt. grossly disorganized and psychotic as well as expressing suicidal thoughts [with] plan to jump off bridge. Pt. is unable to care for herself & sister is unable to care for her." Plaintiff was given Thorazine to sedate her.

The next day, his first day working for Beth Israel as its inpatient unit chief, Dr. Harold Schwartz conducted his initial examination of Ms. Vera. Dr. Schwartz noted in her record:

"34 year old Hispanic female admitted last night [with] hx. of three weeks of increasingly agitated behavior, auditory hallucinations and suicidal thoughts. Last night she was experiencing command auditory hallucinations to jump out a window. She felt compelled to obey & was brought to ER by sister. * * *

"Auditory hallucinations are persistent and she states she will kill herself if the voices don't stop. She denies symptoms of depression or mania or recent drug abuse."

Plaintiff had been hospitalized on prior occasions for acute exacerbations of her schizophrenic condition. These past acute exacerbations were believed to be related to plaintiff's failure to take the medications that had been prescribed for her.

Dr. Schwartz noted on the chart that appropriate medication served to decrease plaintiff's "anxiety about voices, hallucinations and may be responsible for diminishing their threatening nature." At trial, Schwartz observed that plaintiff's "exacerbations, the flareups, were due to, at least in part, to not taking medication."

Haldol and then Prolixin were administered to plaintiff in increasing dosages. The medication had the desired effect: Ms. Vera's hallucinations grew "softer" and there was no sign of

lethal command hallucinations after the third day of hospitalization. Given the plaintiff's history of non-compliance in taking her medicine, a switch from Haldol to oral Prolixin was made in anticipation of administering Prolixin Decanoate, an injectable longer-lasting form of the drug.

The oral Prolixin was increased on July 8th from 25 milligram to 35 milligram doses, taken twice daily. Ms. Vera was stabilized on the latter amount, a total of 70 milligrams daily, from July 9 through July 14. Dr. Schwartz believed that it was having sufficient therapeutic effect.

Dr. Schwartz discontinued the oral Prolixin on July 14, with the last 35 milligram dose given at 6:00 P.M. on that date. He directed that plaintiff receive a 50 milligram injection of Prolixin Decanoate the next morning. This was done in anticipation of plaintiff's discharge. However, as plaintiff's psychiatric expert testified, and the jury was empowered to believe, that amount was inadequate to maintain plaintiff on the same therapeutic level of oral medication she had been on (70 milligrams daily). In making a transition from oral to injectable Prolixin, Dr. Tuckman explained, "you need about 25 percent, 20, 25 percent more of the injection to equal the oral form because of the way they are absorbed and the way it is dissipated through the body." Thus, by Dr. Tuckman's calculation, plaintiff would require about 87.5 milligrams of Prolixin Decanoate to maintain the same therapeutic effect as the oral dosage.

Dr. Tuckman also noted that the final dosage of oral Prolixin no longer had any therapeutic effect 24 hours later—by the early evening of July 15. While plaintiff had Prolixin in her bloodstream at that time—since oral Prolixin has a half-life of three to five days—it was an amount far less than 70 milligrams. Because of the different, and substantially slower, process by which an intramuscular injection of Prolixin is absorbed into the bloodstream, the 50 milligram injection administered to plaintiff at 11:00 on July 15, had no effect in the following 48 *or more* hours. For a significant period of time, therefore, plaintiff was no longer receiving the therapeutic benefit of the oral Prolixin and not yet benefiting from the Prolixin Decanoate. It was during this "window period" that Dr. Schwartz discharged plaintiff from the hospital at 9:30 A.M. on July 17.

Notwithstanding defendants' attempts to characterize it otherwise on appeal, it was not Dr. Tuckman's testimony that it would have been appropriate for Dr. Schwartz to discharge

plaintiff if only he had waited exactly 48 hours. As the majority correctly notes, none of the medical witnesses contended that such a mechanical approach would have been compatible with responsible and careful medical practice. The therapeutic effect of antipsychotic medication, all the witnesses agreed, must be determined by clinical examination, that is, by observing the patient's response over the course of time.

The 48-hour period referred to by plaintiff's expert represented a minimum period before which there would have been no point at all in attempting to evaluate the therapeutic effect of the injection. It was Dr. Tuckman's opinion that Dr. Schwartz should have watched plaintiff and assessed her behavior for a period of time following the 48-hour period. He stated that "you wait at least two days or more to make sure that the effect of the Decanoate is going to be at [the same therapeutic] level [of the pills]."

Defendants' own expert, Dr. Chalemian, agreed that far more than a limited observation is required to make proper assessment of the drug's effect. One must talk to the patient "repeatedly over time * * * to assess that the command hallucinations of a dangerous nature disappeared" in response to the medication. Thus, while it is true as the majority points out that predictions of future suicidal conduct necessarily involve a degree of calculated risk, the issue before the jury was whether Dr. Schwartz went about computing that risk in Ms. Vera's case in a manner consistent with the duty of care he owed her. The jury's finding that Dr. Schwartz committed malpractice, by failing to conduct repeated interviews and observation of Ms. Vera *after* the medicine could reasonably have been expected to have taken effect, while perhaps not the only conclusion which could have been reached based on the evidence in the record, is one which clearly has a foundation in the evidence.

On July 13 the nursing staff, social workers and other hospital employees went on strike. According to Dr. Henry Pinsker, an Associate Director of Beth Israel's psychiatric department from 1974 to 1992, "to the extent that it was consistent with good practice, patients would be discharged a little bit earlier [due to the strike]." Dr. Schwartz prepared plaintiff's discharge resumé and his evaluation of her "discharge condition" on July 15th, two days prior to her actual discharge. He initially decided to discharge plaintiff "to self" on the morning of July 16—not even 24 hours after the administration of the injectable Prolixin. He subsequently

changed the discharge time to the morning of the 17th because plaintiff's sister requested additional time to hire a home attendant or aide.

On July 15 Dr. Schwartz observed that plaintiff "no longer has command hallucinations to kill herself, continues to have aud. halluc. which comment on her behavior. Remains withdrawn & seclusive." Dr. Pinsker testified that "if everybody was doing the job right," the hospital record should have contained a page, on which psychiatric notes and observations were recorded, for each and every day that plaintiff was confined—that is, from June 27 to July 16. There was no "daily psychiatric notes" page in the record corresponding to July 16 (the day before plaintiff's actual discharge), an omission which Dr. Pinsker regarded as unusual.

Dr. Pinsker suggested that in such circumstances one might look to the nursing flow chart for some indication of how the patient was doing on that date. The nursing flow chart reported that plaintiff had a significant change in behavior during the day shift on the 16th, as a psychiatric resident, Dr. Strumpf, noted by checking the appropriate box on the preprinted form. Based on the testimony about the way the form was intended to be used, the jury could rationally infer from this indication that plaintiff underwent a negative change. Although the corresponding page with psychiatric notes for the 16th was missing, it is notable that, on the only other day that a change in behavior was indicated on the nursing flow chart (June 29), the psychiatric notes for that date reported suicidal ideation, severe depression, and crying and screaming.

On the day of plaintiff's discharge, her sister picked her up at 9:00 A.M. Dr. Schwartz told plaintiff's sister that Ms. Vera should return to the emergency room in a week for an injection of medication. He also noted that plaintiff was still hearing voices. According to plaintiff's sister, Ms. Vera did not look very well and appeared mechanical.

Once home, plaintiff was introduced to the nursing aide, who prepared some food for plaintiff and then sat down to watch television. Ms. Vera remembers hearing voices at that time instructing her: "You better jump out the fire escape."

Plaintiff ate the food, went to the fire escape at the kitchen window, and jumped.

As a result of the accident, plaintiff suffered severe injuries, including amputation of her right leg above the knee, paralysis from the waist down, and complete loss of control of bladder and bowel functions.

This review of the evidence makes clear that, contrary to the position of the majority, the trial court did not err in submitting this case to the jury, as there was legally sufficient evidence upon which a jury could find defendants liable. Furthermore, the verdict which the jury did reach, was not against the weight of the evidence. Dr. Tuckman's testimony does not represent, as the majority states, " 'at most, a difference of opinion among physicians' " which cannot support a finding of malpractice. The majority's selective focus on Dr. Tuckman's response to one question on cross-examination, which must be viewed in context, ignores all the other evidence on which a jury could conclude that under all the then existing circumstances, Dr. Schwartz's July 15 decision to discharge plaintiff was undertaken in a manner that constituted a departure from accepted standards of care. In short, a fair reading of the record supports a rational line of inferences by which a jury could conclude that the decision to release Ms. Vera, made two days after the strike started and less than 24 hours after the injection of Prolixin, and apparently without proper consideration of the negative change noted by Dr. Strumpf on July 16, constituted malpractice. Thus, the evidence was not legally insufficient, and the trial court did not err by refusing to grant the motion to dismiss the complaint before submitting the case to the jury.

Not only would I affirm the trial court's decision to submit this case to the jury, I would reject the alternative grounds for reversal advanced by defendants, that the verdict reached by the jury was against the weight of evidence. The jury's finding of liability on the theory that Ms. Vera was released by defendants before a proper determination could be made whether the Prolixin Decanoate was having its desired therapeutic effect and whether she was medically fit to be discharged from the hospital should be affirmed.