Raul **PEREZ** and Mercedes **Perez,** Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

No. 98 Civ 5756 SAS.

United States District Court, S.D. New York.

Aug. 11, 1999.

Peter D. Assail, Assail & Yoeli, LLP, New York City, for plaintiffs.

Amy Benjamin, Assistant United States Attorney, Southern District of New York, New York City, for defendant.

*FINDINGS OF FACT AND*
*CONCLUSIONS OF*
*LAW*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

This is a medical malpractice action brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the acts of negligence alleged in the complaint took place at the Manhattan Veteran's Administration Medical Center ("VAMC"), which is located in the Southern District of New York.

Plaintiffs' claims were tried to the Court without a jury in accordance with 28 U.S.C. § 2402. Plaintiffs' claims consisted of Raul Perez's ("Perez") claim of negligent medical treatment (Count I of the complaint) and Mercedes Perez's ("Mrs.Perez") claim of loss of consortium (Count III of the complaint).

Because this case was tried without a jury, it is important to recall the standard that would govern a jury's deliberations had one been called upon to reach a verdict. Under New York law, a jury would have been given the following instruction:

Malpractice is professional negligence and medical malpractice is the negligence of a doctor. Negligence is the failure to use reasonable care under the circumstances, doing something that a reasonably prudent doctor would not do under the circumstances, or failing to do something that a reasonably prudent doctor would do under the circumstances, it is a deviation or departure from accepted [medical] practice.

A doctor who renders medical service to a patient is obligated to have that reasonable degree of knowledge and ability which is expected of doctors who perform that operation in the medical community in which the doctor practices.

The law recognizes that there are differences in the abilities of doctors, just as there are differences in the abilities of people engaged in other activities. To practice medicine a doctor is not required to have the extraordinary knowledge and ability that belongs to a few doctors of exceptional ability. However every doctor is required to keep reasonably informed of new developments in his field and to practice medicine in accordance with approved methods and means of treatment in general use. The standard of knowledge and ability to which the doctor is held is measured by the degree of knowledge and ability of the average doctor in good

standing in the medical community in which the doctor practices.

In performing a medical service, the doctor is obligated to use his best judgment and to use reasonable care. By undertaking to perform a medical service, a doctor does not guarantee a good result. The fact that there was a bad result to the patient, by itself, does not make the doctor liable. The doctor is liable only if he was negligent. Whether the doctor was negligent is to be decided on the basis of the facts and conditions existing at the time of the claimed negligence.

A doctor is not liable for an error in judgment if he does what he decides is best after careful examination if it is a judgment that a reasonably prudent doctor could have made under the circumstances.

If the doctor is negligent, that is, lacks the skill or knowledge required of him in providing a medical service or fails to use reasonable care and judgment in providing the service, and such lack of skill or care or knowledge or the failure to use reasonable care or judgment is a substantial factor in causing harm to the patient, then the doctor is responsible for the injury or harm caused.

1A New York Pattern Jury Instructions–Civil 2:150 (3d ed.1998).

## II. *PRELIMINARY FINDINGS OF FACT*

1. Perez was born in 1931, and is presently 68 years old.

2. Mrs. Perez was born in 1931 and is presently 67 years old.

3. After being diagnosed with advanced local prostate cancer, Perez underwent surgery at the VAMC on August 20, 1993, for the purpose of removing the cancer.

4. This procedure is known as a "prostatectomy," and the particular kind of prostatectomy that Perez underwent is known as a "radical perineal prostatectomy." The word radical simply means that the entire prostate is removed. A more common procedure is known as a "radical retropubic prostatectomy." The difference between the two procedures is the approach taken by the surgeon. In the perineal approach, the incision is made between the scrotum and the rectum, which allows better visualization of the anastomosis, the joining of the urethra and the bladder. *See* Trial Transcript "Tr." 715–16, 802–03 (Dr. Eli Lizza ("Dr. Lizza"), Government's urology expert); Government's Exhibit ("GX") D. This approach has a higher incidence of impotence and rectal injury (11% of perineal approaches result in rectal injury compared to 1% of retropubic approaches, GX E), but is less bloody, resulting in a lower likelihood of blood transfusions. In the suprapubic approach, the incision is through the abdomen, below the belly button and above the pubic bone, and allows better visualization of the lymph nodes. There is no claim that the choice of the perineal approach was negligent.

5. During the surgery, a Foley catheter was inserted into Perez's bladder, to allow him to urinate and to protect the anastomosis, so that it could properly heal. This is standard procedure. A Penrose drain was also inserted, to permit any urine leaking from the anastomosis to exit from the site of the surgical incision. The Penrose drain was removed on August 22, 1993. Tr. 184 (Dr. Pablo Torre ("Dr. Torre"), attending urologist in charge of Perez's care at the VAMC). The Foley catheter was discontinued on August 30, 1993, the tenth post-operative day. Tr. 183 (Dr. Torre). It is noteworthy that Perez had a fever on that day. Tr. 188–89 (Dr. Torre); 758–59 (Dr. Lizza).

6. Perez did not have any cystograms, Methylene blue or charcoal tests between post-operative days one and ten.

7. There is some dispute as to the exact time the Foley catheter was removed. Based on all of the medical records and the trial testimony, I find that the catheter

was most likely removed between 11 p.m. and midnight on August 30. Tr. 189–94, 197–98 (Dr. Torre). This was likely done by a member of the house staff, without the aid of any visualization technique, such as a cystoscope (a flexible telescope inserted through the urethra to the bladder) or a cystogram (injecting an x-ray dye to allow surgeon to view the anastomosis).

8. Following the removal of his Foley catheter on August 30, 1993, Perez went into urinary retention. He was given Tylenol at approximately 5 a.m. on the morning of August 31. *See* One Time Medication Record, GX A, Bates 132; Tr. 525–26 (Dr. Michael S. Brodherson ("Dr. Brodherson") Plaintiffs' urology expert).

9. As a result, sometime during the early morning hours of August 31, 1993, attempts were made to reinsert the catheter. It is not clear whether more than one attempt was made. What is known is that the attempts were made without the aid of a cystoscope or cystogram and were unsuccessful. Dr. Rosenblum, the chief resident, was present at the first recatheterization attempt. Tr. 200–201 (Dr. Torre). Plaintiff claims that he was injured during these attempts to blindly reinsert the catheter.

10. On August 31, 1993, the physicians booked Perez to the Operating Room for the purpose of performing a flexible cystoscopy to replace the Foley catheter under direct visual guidance. Tr. 207–208 (Dr. Torre).

11. The operation was booked for 10:32 a.m. and was completed at 10:44 a.m. Tr. 208 (Dr. Torre); GX A at Bates 102–03. A Foley catheter was reinserted into Perez's bladder.

12. The operative note for the August 31, 1993, flexible cystoscopy states that Perez's anastomosis "was visualized and found to be intact and open with easy entrance into the bladder using the flexible scope." GX A at Bates 102–03.

13. The operative note for the August 31, 1993 flexible cystoscopy further states

that "[a]ttempts to reinsert this catheter on the floor were met with difficulty with the catheter meeting resistance at the level of the bladder neck. . . . The angulation at the bladder neck was felt to be such that it made the catheterization difficult." GX A at Bates 102–03.

14. After August 31, 1993, the VAMC physicians administered a charcoal test to determine if any of the charcoal was passed in the urine. This test shows that the doctors were concerned that Perez might have developed a recto-urethral fistula, an abnormal communication between the urethra and the rectum. The charcoal goes through the intestine and the rectum. If there is a fistula, the urine might show charcoal. This test was negative. Plaintiff argues that the use of this test immediately after the reinsertion of the catheter demonstrates that the physicians believed that they had injured the anastomosis during the removal and reinsertion of the catheter, and might have created a recto-urethral fistula.

15. A cystogram performed on September 7, 1993, one week after the reinsertion of the catheter, showed some leaking, indicating a break in the anastomosis. The medical term for the test result was that it showed an "extravasation." A VCU (voiding cystourethrogram) done on the same date showed the same result.

16. On September 10, 1999, a second charcoal test was done. Once again, this test was negative, demonstrating that there was no urine leaking from the rectum or feces traveling through the urethra. As a result, the physicians concluded that there was no recto-urethral fistula.

17. A cystogram and a VCU (voiding cystourethrogram) performed on September 13, 1993, indicated that there was a communication between the proximal urethra and the skin of the perineum. This is known as a urethro-cutaneous fistula and simply means that urine was leaking into the perineum. The VAMC physicians used Foley catheter drainage to treat Per-

ez's anastomotic leak of urine. The cystogram also showed a stricture of the urethra. Tr. 80 (Dr. Torre); 773–76 (Dr. Lizza); GX. A at Bates 90.

18. On September 20, 1999, another cystogram was done as well as a study known as a methylene blue test. The latter test consists of injecting blue dye into the bladder through the catheter to see where the dye goes. While there are no results of the cystogram in the record, the methylene blue test revealed blue dye on the perineum, documenting the presence of an anastomotic leak. No blue dye was excreted through the rectum, so the study was negative for the presence of a recto-urethral fistula.

19. On September 23, 1993, a hypaque enema study was conducted, which injects dye into the rectum to determine if there is an abnormal communication with the bladder. This test was negative.

20. A cystoscopy that had been planned for September 25, 1993 was canceled.

21. On September 28, 1993, Perez was discharged from the hospital. By that time the Foley catheter had been removed and there was no further sign of any leaking from the anastomotic site through the perineum. Tr. at 242, 247, 249, 256–257 (Dr. Torre); 494–95 (Dr. Brodherson); 779–80 (Dr. Lizza).

22. Antibiotics were administered after the prostatectomy. These antibiotics cause inflammation of the colon due to the suppression of the normal flora. As a result, Perez experienced diarrhea, and treatment with Kaopectate was begun on August 31.

23. On September 3, 1999, Perez's stool tested positive for the C. dificile bacteria, which was treated with vacomycin. After he was discharged from the hospital on September 28, 1993, he continued to experience diarrhea, and still had a positive test for the C. dificile bacteria on October 13, 1993.

24. On October 30, 1993, a urinalysis was negative for the presence of any bacteria (fecal material) in the urine. Tr. 795–96 (Dr. Lizza); GX A–IIA at Bates 4.

25. On November 30, 1993, approximately two months after his initial discharge from the hospital, Perez returned to the VAMC complaining of questionable "pneumaturia," a symptom of passing gas through the penis that is indicative of a recto-urethral fistula. Joint Pretrial Order ("JPTO") Undisputed Facts at ¶ 21.

26. Two weeks later, on December 14, 1993, the VAMC physicians examined Perez and preliminarily confirmed the presence of a recto-urethral fistula, by means of a cystogram and a VCU. JPTO at ¶ 22.

27. After diagnosing the recto-urethral fistula, the VAMC physicians decided to treat it initially through urinary diversion. They tried urinary diversion first by means of a Foley catheter (from late December 1993 to March 3, 1994), and then switched to a suprapubic cystostomy tube (March 3, 1994 to August 1994). JPTO at ¶ 23.

28. On January 19, 1994, a cystoscopy report showed a stricture at the anastomosis. Tr. 262–64 (Dr. Torre); 814–15 (Dr. Lizza); GX A–IIA at Bates 121.

29. In August, 1994, approximately eight months after the fistula was diagnosed, and after it did not heal through urinary diversion, the VAMC physicians attempted to repair the fistula surgically. JPTO at ¶ 24.

30. An operation to close the fistula was performed on August 26, 1994. This surgery was unsuccessful. JPTO at ¶ 26. A colostomy was also created during this surgery for the purpose of diverting feces from the area of the fistula to further help it to heal. JPTO at ¶ 25.

31. A second attempt at surgical repair performed in February 1995 was also unsuccessful. JPTO at ¶ 27.

32. Since the February 1995 operation, Perez's fistula has failed to heal spontane-

ously. His fistula persists to this day, and he remains on fecal diversion via colostomy. JPTO at ¶ 28.

33. Despite a recurrence of Perez's cancer in March 1995, his cancer has been contained. His life-span will not be affected by it. JPTO at ¶ 29. At this time it is agreed that his life-span is 13.6 years. Tr. 1121–22.

34. Perez is continent of urine. JPTO at ¶ 30. There is no competent proof of urinary sphincter damage. Tr. 371 (Dr. Norman S. Bloom ("Dr. Bloom"), surgical oncologist and Plaintiffs' damages expert).

35. Perez currently still has a recto-urethral fistula. JPTO at ¶ 31. There is no competent proof of rectal sphincter damage. Tr. 375–76 (Dr. Bloom).

36. Perez's recto-urethral fistula causes urine to leak out of his rectum at times. JPTO at ¶ 32.

37. Perez has no control over the leakage of urine from his rectum. JPTO at ¶ 33.

38. Perez's recto-urethral fistula requires him to place some tissue paper at the entrance to his rectum to absorb the urine that leaks out of his rectum at times. JPTO at ¶ 34.

39. Perez has had a colostomy since August 1994. JPTO at ¶ 35. He has had two surgeries for a prolapse of the colostomy. The first was in August 1995, and the second in December 1995. His colostomy is permanent.

40. Perez suffers from erectile dysfunction. However, there is no competent proof that this was caused by the presence of the recto-urethral fistula. In fact, Perez had decreased erectile function prior to his prostatectomy. GX A at Bates 33.

41. Perez is currently able to bathe and dress himself, drive a car, travel by himself to visit relatives in Cuba, do the dishes and minor repairs at home, and go walking for exercise. JPTO at ¶ 36.

42. Perez did painting and minor repairs around the house prior to his prostatectomy. JPTO at ¶ 37.

43. Perez is making no claim for loss of earnings, either past or future, in this action. JPTO at ¶ 38.

44. Aside from *de minimis* amounts, Perez has not incurred any medical expenses for his medical treatment at the VAMC. JPTO ¶ at 39.

45. All physicians and staff who treated Perez at the VA hospital were employees of the United States at the time of treatment. JPTO at ¶ 40.

### III. *PLAINTIFFS' CLAIMS*

46. The VAMC physicians and/or staff departed from good and accepted medical practice when they removed Perez's Foley catheter on the tenth post-operative day.

47. The VAMC physicians and/or staff departed from good and accepted medical practice by failing to perform a cystogram or VCU before or at the time they removed the Foley catheter on the tenth post-operative day.

48. The VAMC physicians and/or staff departed from good and accepted medical practice by continuing to attempt to reinsert Perez's Foley catheter on the tenth post-operative day outside of the cystoscopy suite and without visualization.

49. A cystogram, rather than a cystoscope, should have been used during the reinsertion of the Foley catheter in the cystoscopy suite on the morning of August 31, 1993.

50. The VAMC physicians and/or staff departed from good and accepted medical practice by failing to perform a suprapubic cystostomy when there was evidence of an anastomotic leak of urine and a fistula before Perez was discharged from the hospital.

51. The VAMC physicians and/or staff departed from good and accepted medical practice by failing to promptly divert Perez's urine and feces once a fistula became

evident in November 1993. Specifically, the VAMC physicians and/or staff should have immediately performed a suprapubic cystostomy and a colostomy.

52. Miscellaneous charges of negligence: The VAMC physicians and/or staff departed from good and accepted medical practice by (1) failing to make notes in the chart reflecting the removal of the Foley catheter and the attempts to reinsert it and the circumstances surrounding same; (2) failing to obtain an order of an attending physician to remove the catheter on the tenth post-operative day; (3) attempting to reinsert the catheter without an order of an attending physician before taking Perez to the cystoscopy suite to reinsert the catheter under vision; and (4) unnecessarily manipulating Perez's urethra, by performing cystoscopies and catheterizations, thereby disturbing his urethrovesical anastomosis.

53. Plaintiffs claim that as a result of these negligent acts, Mr. Perez has (1) a permanent recto-urethral fistula; (2) numerous attempts at surgical repair (which failed), and numerous additional surgeries and procedures including, but not limited to, the insertion of a permanent colostomy; and (3) substantial pain and suffering including, but not limited to, humiliation, embarrassment, frustration and depression; inability to engage in sexual and other activities; and loss of enjoyment of life. In addition, Plaintiffs claim that as a result of these negligent acts, Mrs. Perez has lost the society, companionship and services of Mr. Perez.

54. Mr. Perez seeks damages in the sum of two million ($2,000,000) dollars and Mrs. Perez seeks damages in the sum of five hundred thousand ($500,000) dollars.

## IV. *APPLICABLE LEGAL STANDARDS*

55. Under the FTCA, the Government is liable for the torts of its employees in the same manner as a private party, and that liability is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see Molzof v. United States,* 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992). "Law of the place" requires the court to apply the whole law of the state in which the alleged negligent acts occurred. *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

56. To establish a claim of medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injury. *Arkin v. Gittleson,* 32 F.3d 658, 664 (2d Cir.1994). New York law further provides that expert medical opinion is required to make out both of these elements. *See Milano by Milano v. Freed,* 64 F.3d 91, 95 (2d Cir. 1995).

57. The general standard of care for physicians in New York was established in 1898, in *Pike v. Honsinger,* 155 N.Y. 201, 49 N.E. 760 (1898). That standard requires that a physician exercise "that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices.... The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." *Id.* at 209, 49 N.E. 760. *See also Cruz v. United States,* 94 Civ. 6545, 1998 WL 13839 at *8 (S.D.N.Y. Jan.15, 1998).

58. The plaintiffs must prove their claims by a preponderance of the credible evidence. "[A] plaintiff is not required to prove with certainty that his injury was caused by the negligence of the defendant. Rather, he need establish only that negligence was more likely than not the cause." *Shepard v. United States,* 811 F.Supp. 98, 103 (E.D.N.Y.1993) (citing *Ingersoll v. Liberty Bank of Buffalo,* 278 N.Y. 1, 7, 14 N.E.2d 828 (1938)).

59. The United States may not be held to a stricter standard of care than would apply to a private defendant in New York under like circumstances. 28 U.S.C. § 1346(b). Nor is the United States subject to strict liability. *Laird v. Nelms,* 406 U.S. 797, 802–03, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

60. Because the plaintiff bears the burden of proof on negligence, the mere fact that a medical procedure was unsuccessful, or had an unfortunate effect, will not support a claim that negligence had occurred. *See, e.g., Sitts v. United States,* 811 F.2d 736 (2d Cir.1987); *Schoch v. Dougherty,* 122 A.D.2d 467, 504 N.Y.S.2d 855, 857 (3d Dep't 1986).

61. Where alternative procedures are available to a physician, any one of which is medically acceptable and proper under the circumstances, there is no negligence in using one procedure rather than another. *Koehler v. Schwartz,* 48 N.Y.2d 807, 424 N.Y.S.2d 119, 399 N.E.2d 1140 (1979).

## V. *FINDINGS OF FACT WITH RE-SPECT TO NEGLIGENCE*

62. A good deal of expert testimony was offered at trial regarding the appropriate time to remove the Foley catheter post-surgery. Plaintiffs' expert, Dr. Michael Brodherson, a board certified urology surgeon practicing in Manhattan, testified that the catheter should not be removed until three weeks post-surgery. Dr. Brodherson performs only retropubic prostatectomies, as opposed to perineal. Dr. Eli Lizza, the Government's expert, a board certified urologist practicing in New York and New Jersey, testified that the catheter was not removed prematurely. Dr. Lizza, too, performs only retropubic prostatectomies. Dr. Pablo Torre, the treating surgeon, also a board certified urology surgeon, testified that at the time of the Perez surgery, urologists at the VAMC had been removing the Foley catheter at ten days post-surgery in perineal prostatectomies, when the post-operative course was uneventful. Tr. 182 (Dr. Torre). Dr. Torre testified that he had done this thirty times without a single bad result. *Id.*

63. Both of the experts relied on scientific literature addressing the timing of the removal of the Foley catheter.

The Plaintiff relied on the following sources: D.F. Paulson, *Textbook of Urology* (1996) (recommending removal of catheter 18 days post-surgery); J. Gillenwater, et al. *Adult and Pediatric Urology* (1996) (usual to remove at 14 days with a cystogram; however, 62% of their patients in a study had catheter removed on eleventh post-operative day) GX I; Tr. 543–45 (Dr. Brodherson); *Glenn's Urologic Surgery* (5th ed.1998) (recommending removal of catheter on the twelfth day without mention of using a cystogram during removal) GX G; Tr. 538–42 (Dr. Brodherson); Thrasher & Paulson, "Reappraisal of Radical Perineal Prostatectomy" 22 *European Urology* 1 (1992) (removal between 12–14 days without mention of a cystogram) Plaintiffs' Exhibit ("PX") E; Tr. 548–51 (Dr. Brodherson); 858–61 (Dr. Lizza); Frazier & Paulson, "Radical Prostatectomy: The Pros and Cons of the Perineal Versus Retropubic Approach" 147 *The Journal of Urology* 888 (1992) (study of 122 patients with median removal of catheter at eleventh post-operative day, but ranging from 8 to 42 days post-surgery) PX F; Tr. 746–48, 853–56 (Dr. Lizza); Resnick & Bernsley, "Technique of Nerve-Sparing Radical Perineal Prostatectomy" *Atlas of the Urologic Clinics of North America* (1994) (removal "about" 14 days post-surgery) GX H.

The defendant relied on the following sources: Hinman, *Atlas of Urologic Surgery* (1989) (seventh day post-surgery without a cystogram) GX R; Tr. 743–44 (Dr. Lizza); Colbert, "Radical Perineal Prostatectomy: Extreme Distal Approach" *Contemporary Urology* (1996) (recommending removal between tenth and four-

teenth day without a cystogram) GX F; Tr. 808–09 (Dr. Lizza).

64. The clear weight of the expert authority and testimony is that the tenth post-operative day is premature and not recommended. Removal of the catheter at that time constituted a departure from good and accepted medical practice.

65. On the other hand, the clear weight of the expert authority does not require that either a cystogram or VCU be done prior to removing a Foley catheter. Thus, there was no departure from good and accepted medical practice for failing to do either procedure prior to removing the catheter.

66. Attempting to reinsert a Foley catheter outside of the cystoscopy suite and without visualization was not a departure from good and accepted medical practice. Dr. Brodherson's testimony to the contrary is not credible. Tr. 468–70. The record reflects that the Chief Resident was present during at least one such attempt, and I credit Dr. Torre's testimony that this procedure is routinely handled by staff and without visualization. Tr. 200–03 (Dr. Torre).

67. The real question, of course, is whether the blind reinsertion attempts were performed in a negligent manner such as to injure Perez and ultimately cause the leaking which led to the formation of the fistula. As noted at ¶ 9, *supra,* it is not clear how many attempts were made to reinsert the catheter, but the weight of the evidence supports a finding that more than one attempt was made.

68. While more than one attempt does not constitute, in itself, a departure from accepted medical practice, the standard of care requires that the physicians proceed gently rather than forcefully. Perez testified that when the physicians removed the catheter it was "very, very painful." Tr. 408, 1022–23. He testified that "something broke" inside him and it was a very painful thing. *Id.* He went on to testify that "when they pulled it out, *immediately*

they are trying to put it back. . . ." *Tr.* 409 (emphasis added); 1023. He claimed that the physicians "pushed" too hard during their reinsertion attempts and that he experienced a good deal of pain. *Tr.* 410, 1023.

69. This testimony reveals that Perez' recollection of the events cannot be accurate. First, there is no question that the catheter was not reinserted *immediately* after it was removed. The uncontradicted medical testimony is that the catheter was reinserted because Perez went into urinary retention, which did not occur for several hours post-catheter removal. While there are no entries in the medical record showing the precise time the catheter was removed or the time of the attempted reinsertion, Dr. Torre convincingly testified that the removal was probably done around 11 p.m. on the night of August 30. *Tr.* 189, 194. Based on his testimony it appears likely that the blind reinsertion attempts were done early in the morning of August 31, between 5 a.m. and 7 a.m. Tr. 197–98. Second, if the attempts were as rough as Perez described, it would undoubtedly have damaged the anastomosis. Yet, when the anastomosis was viewed by way of a cystoscope at the time the catheter was successfully reinserted, the anastomosis was intact. GX A at Bates 102–03; Tr. 77. Finally, Mr. Perez was given Tylenol at 11:55 a.m. on August 30, before the catheter was removed or reinserted. GX A, Bates 111. No additional medications were given until 5:00 a.m., when Perez complained of pain. *Id.* at 132. At the time of the surgery on August 20 and 21, Perez was given Demerol, a strong pain medication. *Id.* at 132. If he had experienced the kind of significant pain he described, it seems likely that Perez would have requested and been given a stronger pain medication than Tylenol. Tr. 188–90 (Dr. Torre).

70. Based on the totality of the circumstances, I cannot find that the blind reinsertion attempts were so rough as to constitute a departure from accepted medical

practice or were responsible for causing the fistula.

71. Using a cystoscope, rather than a cystogram when reinserting the Foley catheter on the morning of August 31, 1993, was not a departure from good and accepted medical practice. I credit Dr. Torre's and Dr. Lizza's testimony on this point, but not Dr. Brodherson's. Tr. 83–4 (Dr. Torre); 800–03 (Dr. Lizza); 452–53 (Dr. Brodherson).

72. There is no basis to conclude that it was a departure from good and accepted medical practice to fail to perform a suprapubic cystostomy to treat Perez's anastomotic leak, prior to his release from the hospital. The most common treatment for such a leak is the reinsertion of a Foley catheter. *See* PX E; GX J. The reinsertion of a Foley catheter is a less invasive, more conservative approach. Tr. 603–04 (Dr. Brodherson); 760–61 (Dr. Lizza); GX J (Dr. Paulson advises using a Foley catheter to treat an anastomotic leak). In addition, when a stricture of the urethra is present, the insertion of the Foley catheter may actually assist in relieving the stricture. Tr. 773–76 (Dr. Lizza). Perez's September 13 cystogram revealed that he had a stricture of his urethra. Finally, the weight of the evidence reveals that the Foley catheter was successful in allowing the anastomosis to heal, such that it was no longer leaking by September 28, 1993, the date of discharge. Tr. 242 (Dr. Torre); 494–95 (Dr. Brodherson). The catheter was removed before discharge and there was no evidence of leaking. Tr. 247–49, 256–57 (Dr. Torre); 779–80 (Dr. Lizza).

73. It was not a departure from good and accepted medical practice not to have performed a suprapubic cystostomy in December 1993, once the recto-urethral fistula was diagnosed. The weight of the scientific literature cited by Dr. Lizza recommends a conservative approach, namely use of a Foley catheter, as the first choice for treating a fistula. *See* GX K; Tr. 815–817 (Dr. Lizza). In addition, as discussed above, the presence of a stricture

would counsel in favor of continued use of a catheter. A cystoscopy report of January 19, 1994, showed a stricture. GX A–IIA at Bates 121; Tr. 262–64 (Dr. Torre); 814–815 (Dr. Lizza).

Dr. Brodherson cited no literature to support his view that a suprapubic cystostomy should have been done immediately. Rather, he testified that because of the extensive number of prior procedures performed on Perez, a cystostomy would have been the best treatment in this case. I cannot credit this testimony. Dr. Brodherson failed to explain why the prior procedures, which occurred at a time when there was no evidence of a fistula, were relevant to determining the proper treatment of a fistula that first appeared in late November, 1993. There was no good reason for the VMAC physicians to have treated this case as anything but routine: in a routine case where a fistula develops several months post-surgery, the first approach is to use a Foley catheter, for a significant period of time, up to and including three months. *See* GX K. Indeed, a suprapubic cystostomy was performed in March 1994. Tr. 267 (Dr. Torre).

74. It was not a departure from good and accepted medical practice not to have performed a colostomy immediately upon the diagnosis of a recto-urethral fistula. Dr. Lizza testified that the first response to the diagnosis of a fistula should be urinary diversion, not colostomy, in the absence of certain aggravating factors. Dr. Lizza cited an article by Drs. Stephenson and Middleton, appearing in the June, 1996 issue of the *Journal of Urology*, which identified those factors as "uncontrolled systemic infection, abscess formation, quality of the bowel preparation at rectal injury and extent of rectal injury." GX M at 1969. *See also* Tr. 820–24 (Dr. Lizza); GX L (citing local sepsis, gross fecal leakage or systemic sepsis as additional factors warranting colostomy). None of these factors were present here. In addition, the literature counsels that a surgical repair is more likely to be effec-

tive after the tissue has had time to heal and the fistula "matures" by developing scar tissue forming a tract, which possibly can be excised. Tr. 825–26 (Dr. Lizza); GX K. A colostomy is invasive and unpleasant. Because it was not required in this case, it was not a departure from good and accepted practice to have avoided performing this procedure until it was absolutely required.

75. While the notes and entries made by the VMAC in the Perez chart were not as complete as one would hope, it cannot be said that any deficiencies in the chart rose to the level of a departure from good and accepted medical practice. As ably demonstrated by the Government attorney, Ms. Amy Benjamin, a careful reading of the chart does reveal that the so-called missing notes could not possibly have been intentionally omitted. Whenever a doctor's note was missing, a nursing note or a medication note helped to fill in the gaps. A detailed chronology can be pieced together, including during the critical time period of August 30–31, 1993. Contrary to plaintiffs' allegation, it appears likely that an attending physician did order the removal of the catheter and the attempted reinsertion of the catheter on the night and morning of August 30–31, 1993. Tr. 52, 189–98 (Dr. Torre); GX A at Bates 51, 111. Finally, plaintiffs have not demonstrated that there were any unnecessary manipulations of Perez's urethra by virtue of repeated cystoscopies and catheterizations. The weight of the credible evidence is that each cystoscope and catheterization was necessary and required by good and accepted medical practice. Plaintiff cannot have it both ways. On the one hand he argues that cystoscopes and cystograms should have been done earlier and often, both on removal of the catheter and on reinsertion. On the other hand, he complains that too many such procedures were done. This makes no sense. The effort to diagnose and treat Mr. Perez's condition required the use of these procedures.

## VI. FINDINGS OF FACT WITH RESPECT TO CAUSATION

76. The Plaintiffs argue that the premature removal of the Foley catheter caused Mr. Perez's fistula, resulting in a number of surgical procedures, a permanent colostomy, urine leakage from the rectum, loss of erectile function, pain and suffering, and loss of enjoyment of life, as well as his wife's loss of consortium. Plaintiffs have not proved, by a preponderance of the credible evidence, that the premature removal of the Foley catheter caused these events.

77. What caused this fistula to develop? Plaintiffs argue that it was caused by the continual leakage of urine from the anastomosis, which collected in the perineal cavity and eventually formed a fistulous track between the bladder and the rectum. Plaintiffs argue, in turn, that the anastomotic leak was caused by the premature removal of the Foley catheter followed by the unsuccessful attempts at blind recatheterization.

78. Defendant has no burden to provide alternative proof of causation; it can simply rely on plaintiffs' failure of proof. But Defendant posits that the fistula was caused by a combination of leaking urine, a thinning of the rectal wall resulting from the radical perineal prostatectomy, and the long-time presence of the C. dificile bacteria. In sum, all parties agree that the leaking urine played some causative role. Tr. 134–35 (Dr. Torre); 496 (Dr. Brodherson); 889–90 (Dr. Lizza). Plaintiffs say it was the sole cause, Defendant says it was a contributing factor. In either event, the key question is what caused the anastomosis to leak.

79. Prior to addressing this question, I conclude that Plaintiffs have failed to prove that the fistula was caused solely by leaking urine. The weight of the evidence reveals that fistulas develop following prostatectomies and that they happen in the absence of negligence. Tr. 526–27 (Dr. Brodherson). While the Defendant has proferred an alternative theory of causa-

tion, this theory is speculative. The plain fact is that some things in medicine are never known. Based on the evidence submitted at this trial, I cannot say what caused this fistula to develop.

■ 80. I return, then, to the question of what caused the leak from the anastomosis. Perez offers several arguments in support of his theory that it was caused by the premature removal of the catheter. None are persuasive. Plaintiffs first argue that there was no leak from the anastomosis until *after* the premature removal of the catheter. The first proof of leakage was on the September 7, 1993 cystogram. Plaintiffs speculate that given this indisputable temporal connection, the removal of the catheter and the resulting urinary retention, followed by the recatheterizations, *must have* damaged the anastomosis.

81. The problem with this theory is that there is simply no evidence to support it. When the recatheterization was done in the cystoscopy suite, the anastomosis was viewed by use of a cystoscope. It showed that the anastomosis was tight and not leaking. In order to circumvent this incontrovertible proof that neither the urinary retention nor the recatheterizations damaged the anastomosis, plaintiffs argue that if a cystogram had been used instead of a cystoscope, injury to the anastomosis could have been detected. But this argument is clearly speculative. There is no proof of any injury to the anastomosis following the successful recatheterization. Indeed, the proof is to the contrary.

82. Plaintiffs next argue that because the VMAC physicians administered charcoal tests on August 31 and again on September 10, they must have been concerned about a possible recto-urethral fistula. According to Plaintiffs, this demonstrates that they knew they had damaged the anastomosis when they removed the catheter and then reinserted it.

83. This theory, too, must be rejected. The VMAC physicians had good reasons to test for a fistula, aside from any concern arising from the removal and reinsertion of the catheter. As Dr. Lizza and Dr. Torre pointed out, Perez had undergone a radical perineal prostatectomy, which carries a known significant risk of rectal injury, had locally advanced prostate cancer, which can affect the lining of the rectum, and had experienced urinary retention. Tr. 85–90 (Dr. Torre); 904–06 (Dr. Lizza). This combination of factors was certainly sufficient to require the precaution of testing for the presence of a fistula.

84. Plaintiffs' final theory is the presence of the leak on September 7, 1993. Plaintiffs argument is a variety of *res ipsa* —if the leak is there, the defendant's actions must have caused it.

85. This theory, too, must be rejected. Dr. Lizza testified, credibly, and citing to the scientific literature (PX E), that anastomotic leaks following this type of surgery are not uncommon. Tr. 723–36, 947–49 (Dr. Lizza). There are many causes for such leaking, including swelling, stricture, or even healing of the anastomosis. Plaintiffs simply have not demonstrated by a preponderance of the credible evidence that this leak was *caused* by the premature removal of the Foley catheter.

## VII. *CONCLUSIONS OF LAW*

86. The VAMC physicians and/or staff departed from accepted standards of medical practice in their care and treatment of Perez, solely with respect to the premature removal of the Foley catheter. They did not depart from accepted standards of medical practice in their care and treatment of Perez in any other respect.

87. The sole departure from the accepted standard of medical practice by the VAMC physicians and/or staff did not proximately cause any of Mr. Perez's injuries.

88. Accordingly, the Defendant is not liable to the Plaintiffs. Judgment is awarded in Defendant's favor, without costs to either party. The Clerk is direct-

ed to prepare a judgment and close this case.

So ordered.